STATE OF NORTH CAROLINA v. DARYL FREDRICK CRAWFORD

No. 483A94

(Filed 31 July 1996)

1. **Homicide § 250 (NCI4th)— first-degree murder—premeditation and deliberation—sufficiency of circumstantial evidence**

The circumstantial evidence in this case was sufficient to permit the jury to infer that defendant killed his wife with premeditation and deliberation so as to support his conviction of first-degree murder where it tended to show that the victim's body was found in bed; she died from a stab wound to her chest which punctured her heart; defendant was in bed beside her but could not be roused because he had attempted suicide by overdosing on a prescription medication; the marriage between defendant and the victim had been pervaded by marital problems for years, and the victim was going to divorce defendant; there was evidence of threats, ill will, and previous difficulties between defendant and the victim; defendant had stated on several occasions that he would kill the victim before he would allow the court to tell him when he could see his children or his wife; defendant had threatened to kill the victim on several prior occasions; defendant paid the premium on life insurance policies on the day before the victim's death; defendant stayed home from work to accomplish his purpose; defendant wrote a note shortly before killing the victim; a note written by defendant in which he shifted the blame for the problems in their marriage to the victim and stated that the victim had abused him was discovered near the victim's body; and the victim had a defensive wound that extended across three of her fingers, but defendant had no knife wounds when he was examined.

**Am Jur 2d, Homicide § 439.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

STATE v. CRAWFORD

[344 N.C. 65 (1996)]

**2. Evidence and Witnesses § 876 (NCI4th)— hearsay statements by murder victim—state of mind exception**

Testimony by four witnesses that a murder victim had told them that defendant had threatened to kill her, that he had physically abused her, that she sometimes separated from defendant, that defendant had followed or "stalked" her, and that she was becoming more afraid of defendant was admissible under the state of mind exception to the hearsay rule to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to her murder. Furthermore, the trial court did not abuse its discretion in finding that the probative value of the evidence was not outweighed by its tendency to prejudice the defendant.

**Am Jur 2d, Evidence § 866.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed. 170.**

**3. Homicide § 596 (NCI4th)— self-defense—instructions— belief in necessity to kill**

The trial court did not err in instructing the jury that, in order to be entitled to the benefit of perfect or imperfect self-defense, defendant must have reasonably believed that it was necessary to kill the victim in order to protect himself from death or serious bodily injury.

**Am Jur 2d, Homicide §§ 519 et seq.**

**Homicide: modern status of rules as to burden and quantum of proof to show self-defense. 43 ALR3d 221.**

**Accused's right, in homicide case, to have jury instructed as to both unintentional shooting and self-defense. 15 ALR4th 983.**

**Standard for determination of reasonableness of criminal defendant's belief, for purposes of self defense claim, that physical force is necessary—modern cases. 73 ALR4th 993.**

**4. Homicide § 489 (NCI4th)— inference of premeditation and deliberation—examples in instructions—supporting evidence unnecessary**

The trial court did not err by instructing the jury that premeditation and deliberation could be inferred from certain listed circumstances, including lack of provocation by the victim, even if the evidence did not support a finding of lack of provocation by the victim.

**Am Jur 2d, Homicide § 501.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Thompson, J., at the 23 May 1994 Criminal Session of Superior Court, Durham County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 11 April 1996.

*Michael F. Easley, Attorney General, by Mary D. Winstead, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Defendant, Daryl Fredrick Crawford, was indicted on 21 September 1992 for the murder of his wife, Jeannetta Crawford. In a noncapital trial, the jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation. On 1 June 1994, the trial court entered a judgment imposing a sentence of life imprisonment for the first-degree murder conviction.

On appeal to this Court, defendant makes four arguments. After reviewing the record, transcript, briefs, and oral arguments of coun-

sel, we conclude that defendant received a fair trial, free of prejudicial error.

The State's evidence presented at trial tended to show the following facts and circumstances: Jeannetta Crawford (the victim) and defendant were married in 1980. The victim's first husband had died, and she had one child, Charles Clark, who was born of that marriage. Defendant and the victim had two children, Jennifer and Joshua. By 1990, both the victim and defendant were pastors at Solid Rock Full Gospel Church in Durham, North Carolina.

On 19 June 1991, the victim applied for an apartment at Lynn Haven Apartments. On the rental application, the victim stated as her reason for moving out of her present residence: "I have become separated from my husband because of abuse and violence in the home." The victim told defendant that she needed time to herself. On 3 July 1991, the victim filed a motion for a domestic violence protective order, stating that she had left defendant, that she had been receiving threats, that defendant was harassing her and following her, and that she needed protection. Following this incident, the victim moved into Lynn Haven Apartments. While the victim resided at Lynn Haven Apartments, defendant would visit her and the children daily. On 1 November 1991, the victim gave the apartment complex notice of her intent to vacate on 1 December 1991 because she and her husband were going to attempt reconciliation. The victim returned home and lived with defendant.

In May 1992, the victim completed cosmetology school and was working as an apprentice in a beauty salon. While the victim worked at the salon, defendant would call or come by the salon several times a day. His visits made some of the customers nervous. In June 1992, while discussing with her employer the customers' reaction to defendant's visits to the salon, the victim confided in her employer that she and defendant were having marital problems.

The victim's employer, Juliette Alston (Alston), testified at trial that the victim told her that defendant had beaten their youngest child, Joshua. The victim brought Joshua into the salon for a haircut and showed Alston the bruises. Joshua had one bruise on his leg and another on his arm. The victim told Alston that she was upset about defendant beating Joshua and that she had to "get away" from him. The victim also told Alston that she had called Lynn Haven Apartments and asked whether she could rent an apartment again on

an emergency basis because she needed to get out of her house and because she was afraid for herself and her children.

In July 1992, the victim told Alston that defendant had used funds from their checking account to purchase a gun. When the victim confronted defendant and asked him about the gun, defendant put his hands around her throat and said, "I don't need a gun to kill you." Defendant later returned the gun that he had purchased.

Alston further testified that the victim told her that defendant would come home from work at night while she was asleep, and when she awoke, he would be standing over her. At this time, defendant was working nights as a postal clerk. On one occasion, the victim asked, "Why you're [sic] standing over me, Daryl?" Defendant responded, "Because of immense anger. I'm just so angry."

In early August, while the victim was in Delaware on a speaking engagement, Alston had a conversation with defendant. Alston and her husband had taken their dog to defendant's house to breed it with defendant's dog. On that occasion, defendant asked Alston and her husband to pray for him because he and the victim were having marital problems. Defendant said, "Sometimes, I feel like if I had a gun, I would kill her." Alston and her husband talked with defendant and told him that a gun was not the way to handle the situation. Defendant then said that he felt like a fool putting the victim through cosmetology school, and now she was talking about divorcing him. Defendant also told the Alstons, "I don't think I could stand to see her with anybody else."

Yolanda Johnson (Johnson), an evangelist and friend of the victim, testified that she became aware of defendant's and the victim's marital problems in 1986 when defendant spoke with her about them. Defendant would talk to Johnson regarding his marital problems whenever the victim would leave him. On several occasions, the victim stayed with Johnson when she left defendant. Often, when the victim was separated from defendant, defendant would harass Johnson and the victim; threaten Johnson; make harassing telephone calls late at night to Johnson, Johnson's parents, or anyone else he thought knew the victim or her whereabouts; "stalk" Johnson's house; knock on Johnson's door; ask Johnson's neighbors for Johnson's or the victim's whereabouts; and follow the victim.

The victim and Johnson would sometimes go to other cities to preach and minister through music and song. On one occasion,

defendant followed the victim and Johnson to Fayetteville. While in Fayetteville, defendant told Johnson that he would "clip [her] wings" and that he had "bought a gun to do that very thing." Johnson testified that defendant purchased a gun on two occasions and that the victim's children had seen the guns. According to Johnson, the victim said that she was becoming more afraid or fearful of defendant.

Alice Crawford, the wife of defendant's first cousin, testified at trial that defendant had spoken with her about his marital problems and that she had been aware of those problems for about six years prior to the victim's death. She testified that defendant had accused her of interfering in his affairs and had threatened her. She further testified that the victim had told her about defendant's threats and physical abuse in the home and that the victim had decided to leave defendant during the summer of 1992 because he was still interfering in her ministry and in her friendships, even though he had said that he would stop when she moved back in with him.

Sherry Williams (Williams) also testified that defendant had accused her of interfering in his affairs and that defendant had threatened her. Williams testified that the victim had confided in her about the victim's marital problems. Several days after the victim's death, Williams found a note and an audiocassette in a bedside stand in Williams' home. She recognized the handwriting as that of the victim. The note described specific instances of defendant's conduct, including the purchase of a shotgun, harassment, false accusations, physical abuse of the victim and her youngest son, and knocking holes in a door. The victim wrote, "I was forced to leave my house because of his violent actions," and "He has become very abusive." The note consisted of dated entries from "July 4th" until "Friday, August 7th."

On 13 August 1992, both the victim and defendant spoke separately with James Blount (Blount), defendant's brother-in-law, about their marital problems. The victim and her children had gone to Blount's house. While there, the victim asked Blount to check her Volkswagen automobile to determine whether defendant had tampered with the brakes or the engine while defendant was checking the oil. While Blount was checking the automobile, the victim told him that defendant had been pressuring her about her whereabouts, her affiliation with her church, and their family situation. The victim then stated that she felt that she needed to get away again.

After checking the victim's automobile, Blount received a telephone call from defendant. The victim gestured for Blount not to tell

defendant that she was there. During the telephone conversation, defendant told Blount: "I just can't deal with this no more. I can't put up with it any more." Defendant said that the victim was thinking about leaving him again and that she had planned to go through the court this time. Defendant stated several times that, before he would have any court tell him what to do about seeing his children or his wife, he would kill the victim. Blount then attempted to convince defendant that the court may be the "best way to go," if defendant and the victim could not resolve the matter between themselves. Throughout their conversation, Blount reminded defendant about his ministry, his religion, his beliefs, and the fact that both he and the victim were ministers. Blount suggested that they use the situation as a "stepping stone" so they could "direct other couples that were having marital problems."

Defendant, sounding as though he was in tears, said that he was hurting inside and that he was thinking about their life together, how he helped put the victim through school, and how she seemed not to want to contribute to paying the bills. Blount spoke with defendant for some fifteen or twenty minutes, and before the conversation ended, defendant said, "I feel much better that we talked." Defendant then asked Blount whether the victim was there, and Blount responded in the affirmative and invited defendant to come see her. Defendant arrived shortly thereafter, and the victim spoke with defendant in Blount's front yard for approximately ten or fifteen minutes.

On 17 August 1992, the victim, accompanied by Yolanda Johnson, went to Lynn Haven Apartments to apply for an apartment. The property manager noticed defendant pacing around outside. When defendant entered the office, the victim looked surprised. Johnson placed the application in her purse. Defendant left the office, and then the victim and Johnson left. On 18 August 1992, the victim returned the completed application to Lynn Haven Apartments. As before, the victim's application stated that it was an emergency situation due to "domestic violence and harassment" from defendant.

During the month of August, the victim continued to work at Alston's beauty salon, and defendant continued to call and visit. The victim did not work on 19 August 1992, but she went to the salon around 1:30 p.m. to speak with Alston. However, Alston was unable to speak privately with the victim because she was with a customer at the time. The victim told Alston, "[D]efendant went off last night. He

just went wild and stuff." The victim went on to say, "I'm going to call my sister in Charlotte and see if we can come and stay with her because we have to get away." Since Alston could not converse with the victim at that time, Alston suggested that the victim go to the victim's mother's house. Alston testified that the victim seemed very nervous and that the victim had said that defendant had threatened to kill her. Sometime after leaving the salon, the victim went to her mother's house. While there, defendant telephoned and asked the victim, "What you doing, telling your momma that I said I'm going to kill you?"

On that same day, defendant went to his insurance agent to pay the premium on life insurance policies. Defendant did not go to work on the night of 19 August. At some point during that night, while going to the bathroom, the victim's oldest son, Clark, noticed defendant sitting in the living room writing. He also noticed that no one was in his mother's bedroom. On the morning of 20 August 1992, one of the children found his mother's body in the bedroom; the bedroom door had been locked. The victim had a knife wound to her chest. Defendant was in the bed beside her, but he could not be roused. Defendant had attempted suicide by overdosing on his prescription medication, and he was drooling and foaming from his mouth. A suicide note was found near the bed.

Defendant was taken to the emergency room at Duke Medical Center, where he was treated and transferred to the intensive care unit. The treating physician examined defendant to determine whether he had any lacerations on his body. During this examination, the physician noticed blood on both of defendant's hands and on his feet. However, he found no lacerations on defendant's body.

An autopsy of the victim's body revealed that the victim had a stab wound located on the anterior of her chest. This wound punctured the right ventricle of the victim's heart. The medical examiner testified that the stab wound to the heart would have caused the victim to lose consciousness in a minute or less and to be brain dead within an additional two or three minutes. The victim also had an incised wound on the fingers of her left hand, across the ends of her third, fourth, and fifth digits. The medical examiner testified that the wound on the victim's fingers was a defensive wound.

Defendant testified at trial that during the night of 19 August 1992 and the morning of 20 August 1992, he and the victim sat together on the couch in their living room and discussed a separation agreement.

**STATE v. CRAWFORD**

[344 N.C. 65 (1996)]

After discussing the custody of the children, the victim became angry. After some more discussion, the victim got up and went into the kitchen. When the victim returned from the kitchen to the living room, she attacked defendant with a knife. During the struggle for the knife, both defendant and the victim fell onto the couch. The victim grunted. When defendant raised up, he noticed that the knife was in the victim's chest. Defendant pulled the knife from the victim's chest, picked her up, and carried her into the bedroom. Defendant then attempted to overdose on his prescription medication.

[1] Defendant's motions to dismiss made at the close of the State's evidence and again at the close of all the evidence were denied. In his first argument, defendant contends that the trial court erroneously denied his motion to dismiss because the evidence was insufficient to convict him of any culpable homicide. Defendant claimed self-defense and accident at trial and now argues that the evidence was not sufficient to overcome these claims. We disagree.

On a defendant's motion for dismissal on the ground of insufficiency of the evidence, the trial court must determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). What constitutes substantial evidence is a question of law for the court. *Id.* Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988).

In considering a motion to dismiss, the trial court is concerned only with sufficiency of the evidence to carry the case to the jury and not its weight. *State v. Mercer*, 317 N.C. 87, 96, 343 S.E.2d 885, 890 (1986). "The trial court's function is to determine whether the evidence will permit a *reasonable inference* that the defendant is guilty of the crimes charged." *Vause*, 328 N.C. at 237, 400 S.E.2d at 61. The determination of the witnesses' credibility is for the jury. *See Locklear*, 322 N.C. at 358, 368 S.E.2d at 383.

In ruling on a motion to dismiss, "the trial court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence."

*State v. Saunders*, 317 N.C. 308, 312, 345 S.E.2d 212, 215 (1986). "Defendant's evidence rebutting the inference of guilt may be considered only insofar as it explains or clarifies evidence offered by the state or is not inconsistent with the state's evidence." *State v. Furr*, 292 N.C. 711, 715, 235 S.E.2d 193, 196, *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977).

We recently defined first-degree murder as follows:

First-degree murder is the unlawful killing—with malice, premeditation and deliberation—of another human being. N.C.G.S. § 14-17 (1993); *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). Premeditation means that defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing. *State v. Myers*, 299 N.C. 671, 677, 263 S.E.2d 768, 772 (1980). Deliberation means that defendant carried out the intent to kill in a cool state of blood, "not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Hamlet*, 312 N.C. 162, 170, 321 S.E.2d 837, 842-43 (1984).

*State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994). "Ordinarily, premeditation and deliberation must be proved by circumstantial evidence." *Saunders*, 317 N.C. at 312, 345 S.E.2d at 215. Circumstantial evidence is "evidence that is applied indirectly 'by means of circumstances from which the existence of the principal fact may reasonably be deduced or inferred.'" *State v. Thorpe*, 326 N.C. 451, 455, 390 S.E.2d 311, 313 (1990) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 76 (3d ed. 1988)).

Circumstances to be considered in determining whether a killing was done with premeditation and deliberation include: " '(1) want of provocation on the part of the deceased, (2) conduct and statements of the defendant before and after the killing, (3) threats made against the victim by defendant, (4) ill will or previous difficulty between the parties, and (5) evidence that the killing was done in a brutal manner.' " *Saunders*, 317 N.C. at 313, 345 S.E.2d at 215 (quoting *State v. Calloway*, 305 N.C. 747, 751, 291 S.E.2d 622, 625-26 (1982)).

Taken in the light most favorable to the State, the evidence in the instant case tended to show the following: The marriage between defendant and the victim had been pervaded by marital problems for years, and the victim was going to divorce defendant. There was evi-

dence of threats, ill will, and previous difficulties between defendant and the victim. Defendant had stated on several occasions that he would kill the victim before he would allow the court to tell him when he could see his children or his wife. Also, defendant had threatened to kill the victim on several prior occasions. Defendant paid the premium on the life insurance policies on the day before the victim's death. Defendant stayed home from work to accomplish his purpose. Defendant wrote a note shortly before killing the victim. A note, written by defendant, was discovered near the victim's body. In the note found near the victim's body, defendant shifted the blame for the problems in their marriage to the victim and stated that the victim had abused him. The victim had a defensive wound that extended across three of her fingers, but defendant had no knife wounds when he was examined.

We conclude that the circumstantial evidence in this case, taken as a whole, was sufficient to permit the jury reasonably to infer that defendant murdered the victim with premeditation and deliberation. The other elements of murder being clearly present, the judge did not err in denying defendant's motion to dismiss the charge of murder in the first degree based on malice, premeditation, and deliberation made at the close of all the evidence.

[2] In his next argument, defendant contends that the trial court erred by overruling his objections to the introduction of inadmissible hearsay statements of the victim and other declarants made to several of the State's witnesses. Defense counsel made a continuing objection to any hearsay statements of the victim to persons regarding defendant's past abuse. Defendant argues that the statements seriously damaged his self-defense and accident claims by portraying him as an aggressor without giving him a fair opportunity to test the credibility of the statements. Defendant further contends that any probative value of the statements was substantially outweighed by the danger of unfair prejudice.

Defendant specifically challenges the testimony from four of the State's witnesses: Juliette Alston, Yolanda Johnson, Alice Crawford, and Sherry Williams. The testimony of these witnesses was that the victim had told them that defendant had threatened to kill her, that he had physically abused her, that she sometimes separated from defendant, that defendant followed or "stalked" her, and that she was becoming more afraid of defendant. Defendant argues that these statements were not admissible under N.C.G.S. § 8C-1, Rule 803(3)

because the victim's "state of mind does not explain any facet of her relationship with defendant that would tend to refute defendant's case." We conclude, however, that the victim's state of mind was relevant to the issues involved in the instant case, including explaining and refuting defendant's claims of self-defense and accident.

Prior to trial, the State gave defendant written notice of hearsay statements that the State might seek to introduce at trial. However, this issue first arose at trial during the testimony of Juliette Alston. Outside the presence of the jury, the trial court and counsel discussed whether Alston and any other witnesses could testify regarding the statements of the victim and other declarants. Defense counsel objected to "the eliciting of any and all hearsay testimony from this or any other witness." The trial court overruled defendant's objection to the specific statement to which defendant had objected, finding it admissible under the catchall exception of N.C.G.S. § 8C-1, Rule 804(b)(5). Defense counsel then asked the trial court to permit a "continuing objection to any of the testimony here offered." The trial court granted defendant's continuing objection to all of the victim's hearsay statements. *See* N.C.G.S. § 15A-1446(d)(10) (1993); *Duke Power Co. v. Winebarger*, 300 N.C. 57, 265 S.E.2d 227 (1980) (authorizing the use of line objections). We will first consider the hearsay statements made by the victim.

"It is well established in North Carolina that a murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant." *State v. Alston*, 341 N.C. 198, 230, 461 S.E.2d 687, 704 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996); *see State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 301-02 (1993) (state of mind relevant to show a stormy relationship between the victim and the defendant prior to the murder), *cert. denied*, —— U.S. ——, 128 L. Ed. 2d 220 (1994); *State v. Lynch*, 327 N.C. 210, 222, 393 S.E.2d 811, 818-19 (1990) (the defendant's threats to the victim shortly before the murder admissible to show the victim's then-existing state of mind); *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (the victim's statements regarding the defendant's threats relevant to the issue of her relationship with the defendant).

After a thorough review of the record, we conclude that the conversations between the victim and the four witnesses related directly to the victim's fear of defendant and that the victim's statements were properly admitted pursuant to the state of mind exception to the

STATE v. CRAWFORD

[344 N.C. 65 (1996)]

hearsay rule to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to her murder. *See Alston,* 341 N.C. at 231, 461 S.E.2d at 704.

Defendant alternatively contends that, even if the statements were relevant to show the victim's state of mind, the prejudicial effect of the statements substantially outweighs any probative value. The responsibility to determine whether the probative value of relevant evidence is substantially outweighed by its tendency to prejudice the defendant is left to the sound discretion of the trial court. *State v. Coffey,* 326 N.C. 268, 281, 389 S.E.2d 48, 56 (1990). In the instant case, defendant has not demonstrated any abuse of discretion by the trial court, and therefore, the court's ruling will not be disturbed on appeal.

We need not decide whether the trial court erred in the admissibility of any hearsay statements of declarants other than the victim. We note that defense counsel's continuing objection, which the trial court granted, was only to statements made by the victim to these witnesses. "In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4). Since defendant did not object at trial or allege plain error, he has failed to properly preserve this issue for appeal. *State v. Moseley,* 338 N.C. 1, 36, 449 S.E.2d 412, 433-34 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 738 (1995).

[3] In his next argument, defendant contends that the trial court erred in instructing the jury that, in order to be entitled to the benefit of perfect or imperfect self-defense, defendant must reasonably believe that it was necessary to kill the victim in order to protect himself from death or serious bodily injury. Defendant concedes that this Court recently found no error in jury instructions on self-defense that are identical to the instructions given in the instant case. *State v. Richardson,* 341 N.C. 585, 597, 461 S.E.2d 724, 731 (1995). Defendant has given no compelling reason for this Court to depart from its precedent. Accordingly, we reject defendant's argument.

[4] In his final argument, defendant contends that the trial court erred by instructing the jury that premeditation and deliberation

STATE v. CRAWFORD

[344 N.C. 65 (1996)]

could be inferred from the absence of provocation by the victim. Defendant argues that the only relevant evidence in the record showed that the victim did provoke defendant and that the prejudice he suffered due to the trial court's instruction entitles him to a new trial.

The trial court instructed the jury on premeditation and deliberation as follows:

Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proved by circumstances from which they may be inferred, such as a lack of provocation by the victim, conduct of the defendant before, during and after the killing, threats and declarations of the defendant, or the manner or means by which the killing was done.

This instruction is based upon the North Carolina Pattern Jury Instructions. N.C.P.I.—Crim. 206.10 (1989).

This Court recently found no error in a jury instruction on premeditation and deliberation that is essentially the same as the one given in the instant case and rejected a very similar argument. In *State v. Leach*, 340 N.C. 236, 456 S.E.2d 785 (1995), we said: "The instruction in question informs a jury that the circumstances given are only illustrative; they are merely examples of some circumstances which, if shown to exist, permit premeditation and deliberation to be inferred." *Id.* at 241-42, 456 S.E.2d at 789. Thus, we held that "the trial court did not err by giving the instruction at issue here, even in the absence of evidence to support each of the circumstances listed." *Id.* In the instant case, defendant has given no compelling reason for this Court to depart from this precedent.

For the foregoing reasons, we conclude that defendant received a fair trial, free of prejudicial error.

NO ERROR.