657 S.E.2d 894 (2008)
In the Matter of Z.A.K.
No. COA07-641.
Court of Appeals of North Carolina.
March 18, 2008.
Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz, for the State.
Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Barbara S. Blackman, for defendant.
ELMORE, Judge.
On 31 July 2006, the trial court adjudicated juvenile Z.A.K. (defendant) delinquent for involuntary manslaughter and possession with intent to sell and deliver Ecstacy, and on 15 August 2006, the trial court entered an order of Level II disposition. Defendant now appeals.
On 30 September 2005, defendant was with his friends E.H. and A.B. Defendant and A.B. snorted cocaine, but E.H. did not. They went to a high school football game before picking up another friend, A.W., and returned to E.H.'s house. A.B. left, and the remaining friends smoked marijuana with E.H.'s mother and drank; E.H. and defendant also took Xanax obtained from E.H.'s mother.
They went to bed, and the following morning continued to hang out. A.W. snorted cocaine and defendant and E.H. split a pill of Ecstacy. Around 4:00 p.m., the friends went to A.B.'s stepfather's birthday party, where defendant and E.H. split another pill of Ecstacy; A.B. and A.W. also split a pill. Defendant provided all of the Ecstacy. During the party, defendant also provided two pills to a family member of A.B. for twenty dollars.
E.H. consumed a great deal of water over the course of the afternoon. She and defendant split yet another pill, as did A.W. and A.B. Defendant, E.H., and A.W. returned to defendant's house. E.H. continued to drink large quantities of water.
At defendant's house, E.H. complained that she felt sick. She began to vomit profusely and continued to ask for and drink water. Defendant's father checked in with the children, but left after defendant told him that although E.H. was sick, everything was fine.
*896 E.H. exited the bathroom and fell to the ground. Her breathing was labored, and she began to foam at the mouth. A.W. attempted to call 911, but was too distraught. At approximately 11:30 p.m., she eventually managed to call, and handed the phone to defendant to inform the officer of his address. Defendant got nervous and told the operator that nothing was wrong.
A.W. administered CPR when E.H. stopped breathing, and was able to get E.H. to start breathing again. Defendant called a friend, who told him to get E.H. medical attention as soon as possible.
Eventually, defendant went to a neighbor's house to ask for help. He asked the neighbor to take E.H. to the hospital, but asked that the neighbor not call the police, fearing that there would be trouble. The neighbor called 911 and went to defendant's house. Emergency services arrived and took E.H. Eventually, E.H. passed away.
Following a toxicological evaluation, doctors discovered three different types of drugs in E.H.'s system: Ecstacy, cocaine, and methamphetamine. Both the State and defense expert witnesses opined that the cause of death was mixed toxicity drug overdose.
On appeal, defendant first claims that the trial court erred in refusing to grant his motion to dismiss for insufficient evidence. Specifically, he claims that the State failed to prove that his actions were the proximate cause of death. Because we disagree that the State failed to prove proximate E.H.'s cause, we affirm the trial court's adjudication of delinquency for involuntary manslaughter.
Our standard of review for motions to dismiss is well established:
In ruling on a defendant's motion to dismiss, the trial court should consider if the state has presented substantial evidence on each element of the crime and substantial evidence that the defendant is the perpetrator. The elements of involuntary manslaughter are: (1) an unintentional killing; (2) proximately caused by either (a) an unlawful act not amounting to a felony and not ordinarily dangerous to human life, or (b) culpable negligence. The evidence should be viewed in the light most favorable to the state, with all conflicts resolved in the state's favor. . . . If substantial evidence exists supporting defendant's guilt, the jury should be allowed to decide if the defendant is guilty beyond a reasonable doubt.
State v. Replogle, 181 N.C.App. 579, 580-81, 640 S.E.2d 757, 759 (2007) (quotations and citations omitted) (alteration in original). In this case, defendant claims that the State failed to prove the element of proximate cause.
Both in his brief and at oral arguments, defendant focuses on the fact that the medical experts in this case opined that E.H. died from mixed toxicity drug overdose. Defendant claims that because the State failed to prove that E.H. died as a result of the Ecstacy, which the State did prove he provided, the State failed to prove proximate cause. This issue is complex, and we do not decide it in this case. Rather, we rely on defendant's actions after E.H. began to seize, which constitute culpable negligence, and hold that defendant's failure to aid her, after providing her with Ecstacy and undertaking to provide aid, was the proximate cause of her death.
"Culpable negligence is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others." State v. Wade, 161 N.C.App. 686, 690, 589 S.E.2d 379, 382 (2003) (quotations and citations omitted). "Standing alone, culpable negligence supports the submission of involuntary manslaughter." State v. Rich, 351 N.C. 386, 395, 527 S.E.2d 299, 304 (2000) (quotations and citation omitted).
Defendant is correct when he states in his reply brief that "citizens generally have no duty to come to the aid of one who is injured." Doerner v. City of Asheville, 90 N.C.App. 128, 130, 367 S.E.2d 356, 357 (1988) (citation omitted). However, in this case, regardless of whether the Ecstacy that defendant provided was a proximate cause of victim's death, once he provided her with such a dangerous substance and she fell ill, a duty to help her arose.

*897 Risk-creation behavior thus triggers duty where the risk is both unreasonable and foreseeable. . . . The orbit of the danger as disclosed to the eye of reasonable vigilance [is] the orbit of the duty. A duty arises based on evidence showing that a defendant should have recognized that [a victim], or anyone similarly situated might be injured by their conduct.
Little v. Omega Meats I, Inc., 171 N.C.App. 583, 593, 615 S.E.2d 45, 52 (2005) (quotations and citations omitted).
More importantly, once defendant made efforts to aid the victim, he was under a duty to do so with due caution. Our Supreme Court has held that "volunteers in telephoning for aid, had the positive duty to use ordinary care in performing that task, the known and obvious purpose of which, under the circumstances, was to inform the rescue squad where the endangered persons were and an expeditious way to get there." Hawkins v. Houser and Pless v. Houser and Houser v. Hawkins, 91 N.C.App. 266, 270, 371 S.E.2d 297, 299 (1988) (citation omitted). In Hawkins, the Supreme Court addressed a situation in which a land owner gave poor directions to emergency services. "Evidence that in making the call defendants suggested that the rescuers travel to the pond by a time-wasting barricaded road when an unimpeded road was available is evidence that defendants did not use ordinary care." Id.
This Court, too, has held that in endeavoring to provide aid, a person has a duty use reasonable care.
The law imposes upon every person who enters upon an act or course of conduct the positive duty to exercise ordinary care to protect others from harm and calls a violation of that duty negligence. The duty to protect others from harm arises whenever one person is by circumstances placed in such a position towards another that anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, that he will cause danger of injury to the person or property of the other.
Klassette v. Mecklenburg County Area Mental Health, 88 N.C.App. 495, 502, 364 S.E.2d 179, 184 (1988) (quotations and citations omitted).
In this case, defendant's actions were even more egregious than those in the cases above.[1] After the victim first became ill, a mere ten minutes after the group of children arrived home, defendant lied to his father, telling him that everything was fine and sending him away. Even after the victim requested to go to the hospital, defendant took no action. Thirty to forty minutes after the victim went to the bathroom to be sick, she came out, fell to the ground, and began to foam at the mouth within ten minutes. Although A.W. called 911 at approximately 11:30 p.m., defendant lied to the operator, saying, "I'm sorry, my sister called." Even after A.W. screamed at defendant to "tell the truth," defendant represented to the operator that all was well. He did not give the operator his address. Thirty minutes passed from the time that the victim collapsed and began foaming at the mouth. At that point, defendant went to a neighbor's house for help. Even then, when the neighbor went to get his phone, defendant cried, "Oh, God, don't call the police there'll be trouble." It was 12:14 a.m. by the time that the paramedics arrived. At that time, defendant lied once again, claiming that he did not know whether the victim had taken any drugs.
"At the very least, [defendant's] affirmative conduct precluded any other rescuer from rendering the aid allegedly necessary to prevent [the victim's] . . . injuries." Id. At the worst, it actively caused her death. Dr. Karen Chilton affirmed that the victim "could have benefited [sic] from medical intervention *898 if she'd been treated immediately after or soon after the start of her seizures," stating that "some of the complications that I think we saw could have been prevented if perhaps she'd received medical attention more quickly." Defendant breached his duty to the victim, acting with "such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others." Wade, 161 N.C.App. at 690, 589 S.E.2d at 382. The trial court did not err.
Defendant next argues that the trial court erred in its denial of his motion to suppress his statements. We disagree.
Preliminarily, we note that a juvenile court "proceed[s] in accordance with the rules of evidence applicable to criminal cases." N.C. Gen.Stat. § 7B-2408 (2005). Our standard of review is well established:
In considering a motion to suppress a statement for lack of voluntariness, the trial court must determine whether the State has met its burden of showing by a preponderance of the evidence that the statement was voluntarily and understandingly given. On appeal, the findings of the trial court are conclusive and binding if supported by competent evidence in the record.
State v. Nguyen, 178 N.C.App. 447, 451, 632 S.E.2d 197, 201 (2006) (citations omitted).
The thrust of defendant's argument is that the trial court erred in finding that defendant came to the police station and volunteered information, thus obviating the need for advisement of his Miranda rights. Defendant notes that the police contacted his father, rather than defendant himself. His father then decided that defendant would speak to the police. Defendant's father testified that he gave defendant no choice in the matter.
Defendant acknowledges that the door was open throughout the interview and that he was not handcuffed. However, he stresses that he was escorted at all times, even to the bathroom, that he was never told that he was free to leave, and that he was never told that he could refuse to continue the conversation with the police.
We note the State's contention that defendant conceded at trial that "there is no indicia that it was a custodial-type interview. There was no handcuffs, there was no throwing him in the back of the car, that sort of thing." Instead, defendant argued at trial that defendant's father essentially was turned into an agent of the State, and that he was used to coerce defendant into giving his statement.
In either case, the trial court did not err. As the trial court noted, the evidence was clear that at the time of the interview, the investigation was merely exploratory. Defendant was not a suspect. The police requested an interview with defendant, as well as other witnesses, on 4 October 2005, the day after the victim died. Neither the police nor defendant's father employed the use of any force to compel defendant to come to or participate in the interview. At the interview, defendant actually interrupted his father to volunteer information. The only reason that police accompanied defendant to the bathroom was that there was construction and the doors locked automatically. Defendant was free to leave immediately after the interview. He was not charged with any crime until months later, on 25 January 2006.
Based on the "totality of the circumstances," from "the interrogation subject's point of view . . . a reasonable person in defendant's position would [not] have believed that he was under arrest or was restrained in his movement to [a] significant degree." State v. Garcia, 358 N.C. 382, 396-97, 597 S.E.2d 724, 736-37 (2004) (quotations and citations omitted). Accordingly, defendant's argument is without merit.
We also find no merit in defendant's claim that the trial court failed to exercise dispositional discretion. Although defendant notes two instances in which the trial judge indicated a general policy preference on his part for level II dispositions for juveniles who commit felonies, the extended discussion in the transcripts reveals that the judge considered a variety of factors before "design[ing] an appropriate plan to meet the needs of the juvenile and to achieve the *899 objectives of the State. . . ." N.C. Gen.Stat. § 7B-2500 (2005).
Finally, defendant argues that the trial court failed to make a finding that payment of restitution was in defendant's best interest. We agree. "[R]equiring that a juvenile make restitution as a condition of probation must be supported by the record and appropriate findings of fact which demonstrate that the best interest of the juvenile will be promoted by the enforcement of the condition." In re Heil, 145 N.C.App. 24, 31, 550 S.E.2d 815, 821 (2001) (quotations and citations omitted) (emphasis in original). In this case, the trial judge's order merely stated that defendant had the ability to pay restitution without any finding as to it being in his best interest. We therefore reverse the order of restitution and remand with instructions to make findings as to the best interests of defendant.
Having conducted a thorough review of the record and briefs, we affirm all aspects of the trial court's decision except for the order of restitution. Accordingly, we affirm in part, and reverse and remand with instructions in part.
Affirmed in part, reversed and remanded with instructions in part.
Judges STEELMAN and GEER concur.
NOTES
[1] We note that both of the above cited cases arose in tort, rather than in criminal law. However, because the concepts of duty and negligence are, at their base, tort concepts, we feel free to analogize to the current criminal case. In doing so, we realize that the level of conduct required to sustain criminal liability is much different than that required in tort. See Replogle, 181 N.C.App. at 581-82, 640 S.E.2d at 759 ("[C]ulpable negligence is more than the actionable negligence often considered in tort law, and is such recklessness or carelessness proximately resulting in injury or death as imports a thoughtless or needless indifference to the rights and safety of others. . . . ").