IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-618

No. COA 20-917

Filed 16 November 2021

Buncombe County, No. 15 CRS 484

STATE OF NORTH CAROLINA

v.

JESSICA LEA METCALF, Defendant.

Appeal by Defendant from judgment entered 23 August 2019 by Judge Marvin P. Pope, Jr., in Buncombe County Superior Court. Heard in the Court of Appeals 22 September 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Thomas H. Moore, for the State.*

*Anne Bleyman for Defendant-Appellant.*

GRIFFIN, Judge.

¶ 1     Defendant Jessica Lea Metcalf appeals from a judgment entered upon a jury verdict finding her guilty of involuntary manslaughter of a three-year-old child, Archie.[1]  On appeal, Defendant contends that the trial court erred by (1) denying Defendant's motion to strike the jury venire; (2) failing to grant Defendant's motion

---

[1] We use a pseudonym to protect the anonymity of the child and for ease of reading. *See* N.C. R. App. P. 42.

to dismiss for insufficient evidence; and (3) failing to dismiss the indictment due to insufficient notice. Upon review, we hold that Defendant received a fair trial, free from error.

## I. Factual and Procedural History

¶ 2 In January 2015, Defendant cohabitated in a trailer home with her boyfriend, Brandon Rathbone, in Buncombe County. The trailer home had no running water because the well pump "froze and busted" in the cold. The trailer home also had no house telephone, and Defendant's cell phone had minimal service. Defendant stated that an electric heater was used to heat the trailer when it was cold, and that the trailer's wall would get hot when Defendant and Mr. Rathbone used the heater.

¶ 3 Archie was Mr. Rathbone's nephew. On or around 20 January 2015, Archie came to stay with Mr. Rathbone and Defendant for several days while Archie's mother was hospitalized to give birth to another child. Mr. Rathbone's parents, Wanda and Stephen Neil, lived nearby. Typically, Mr. or Mrs. Neil would pick up Archie between 8:30 and 9:30 a.m. to care for Archie while Mr. Rathbone was at work. Defendant had taken time off of work to watch Archie when Mrs. Neil, Mr. Neil, and Mr. Rathbone were unwilling to do so.

¶ 4 At approximately 7:00 p.m. on 27 January 2015, Defendant took four tablets of Xanax, although Defendant stated she was only allowed to take "up to three [tablets] a day." Defendant also stated she could not remember if she had gotten up

in the middle of the night to take more Xanax. Between 6:00 and 6:15 a.m. on the following morning, Mr. Rathbone left home for work like he did every day. After Mr. Rathbone left for work, Defendant heard Archie moving around, checked on him, and noticed Archie had wet the bed, so she changed his pants.

¶ 5        At approximately 7:00 a.m., Defendant turned on the heater in the living room. After watching television for some time, Defendant went to the bathroom and "smoked about a half of a cigarette." Defendant stated that she would only smoke outside or in the bathroom. Upon returning to the living room, Defendant observed that sparks were coming from either the heater or the electric outlet and that the sparks were already burning holes in the couch cushions. The couch was already smoking from the sparks.

¶ 6        In an attempt to stop the burning, Defendant grabbed a blanket to smother the fire; however, the blanket caught fire and stuck to Defendant's hands and burned her. Defendant stated that she did not immediately get Archie out of the trailer home because she believed that she could put out the fire. Defendant stated she went to the front door and yelled for help. Defendant then went to the kitchen to look for water to extinguish the fire, but there was no running water in the mobile home. Defendant stated that "usually they keep several gallons [of water] in the kitchen area, but they were empty." After finding a bleach jug on the dryer, Defendant returned to the front door to call for help again. Mr. Rathbone stated there were two

fire extinguishers under the kitchen counter. Defendant "tried to use the fire extinguisher but it didn't work [because] [s]he squeezed the trigger, but she didn't pull the pin out."

¶ 7    Defendant stated a neighbor, Tammy Peek, arrived at the burning structure and escorted Defendant down a hall and out of the back door of the trailer home. Ms. Peek claims this occurred around 8:20 a.m. Ms. Peek, however, stated that Defendant was already standing in the yard outside of the burning trailer home when Ms. Peek arrived at the scene, and that Ms. Peek never entered the trailer home. Furthermore, Defendant claimed that she repeatedly mentioned her purse and Archie to Ms. Peek as they exited the trailer home together, but Defendant could not remember if she was speaking out loud or only thinking about the purse and Archie in her head. Conversely, Ms. Peek stated that she asked Defendant if anyone else was in the home, and Defendant said no, that "her children . . . were with their father[.]" Ms. Peek stated Defendant was asked "numerous times . . . [on] [a]t least four or five" occasions if anyone was in the trailer, and that Defendant replied "there's no one in the home."

¶ 8    Defendant stated that she could have gotten Archie out of the trailer home when she exited, but Defendant did not get Archie out because "she thought she could put the fire out."

¶ 9    Ms. Peek ran back to her house approximately 130 to 150 feet away from the burning trailer home, woke her sleeping boyfriend Billy Boyd, and called 911 with

her cell phone. After placing the 911 call, Ms. Peek and Mr. Boyd returned to the burning trailer home where Defendant remained standing in the front yard. Again, Ms. Peek and Mr. Boyd asked Defendant if there was anyone else in the home. Even after being asked "multiple times" if there was anyone in the house, "[Defendant] consistently told [Ms. Peek and Mr. Boyd] no." Ms. Peek stated that Defendant asked for her cell phone and uniforms. Mr. Boyd observed that Defendant's face looked as though something "blew up" on it. Defendant then asked for a cigarette and when Ms. Peek gave her one, Defendant put it in her mouth backward, with the "tobacco part in, [and was] going to light the filter." Mr. Boyd then departed to inform Mr. Neil about the fire.

¶ 10        Mr. Neil and Mr. Boyd met outside the Neil home, and Mr. Boyd told Mr. Neil about the fire. Mrs. Neil informed Mr. Rathbone that his home was burning after Mr. Neil reported the incident. When Mr. Boyd asked Mr. Neil if there were any children in the trailer home, Mr. Neil answered that Archie was there. Mr. Neil then called 911 to inform emergency services that someone was inside the trailer home. Mr. Boyd and Mr. Neil departed the Neil home together to return to the burning trailer home. Mrs. Neil was unable to make it to the burning trailer home. Upon arriving at the trailer home, Mr. Neil asked Defendant where Archie was, and Defendant replied, "his daddy had him."

¶ 11        Shortly after the initial dispatch call, 911 communications dispatched

firefighters from the Leceister Fire Department. Jeff Keever and Joshua Reeves were the initial firefighters on the scene. Keever stated he and Reeves were notified by dispatch while en route of a possible child entrapment in the trailer home. Keever estimated he arrived at the fire approximately three to four minutes after receiving the call. Upon arriving at the scene, Keever observed Defendant and Ms. Peek in the driveway, and the trailer presented "heavy smoke and heavy fire." Although Keever's focus upon arrival was on the entrapment, Keever asked for confirmation from Defendant. When asked if there was anybody still inside, Defendant stated that "[t]he kids are with their daddy." In response, Keever erroneously "notified all dispatch that there was no confirmed entrapment." Despite Defendant's misinformation, Keever stated that with their next help "about 15 minutes away" and "with that much involvement and that much smoke . . . that there is a point of no return." Clarifying, Keever stated that "there wouldn't have been any life in there. . . . [W]e would have been risking our lives to go in there and try to save nothing."

¶ 12        During this time, Reeves attempted to get control of the fire and was interrupted by Mr. Neil, whom Reeves had to wrestle off the porch of the trailer home. According to Reeves, Mr. Neil was adamant that Archie was in the home. Reeves also stated at that time, "[t]here was no hope of going inside" and that "[Reeves] wouldn't have survived going into that room with [his] gear on much less letting [Mr. Neil] go

inside without it." Christopher Brown, the Chief of Leicester Volunteer Fire Department, arrived and assumed command of the scene. Chief Brown reported that once the firefighting crews gained access to the structure, they located the deceased child on the bedroom floor of the trailer home.

¶ 13    Breena Williams, an arson investigator with the Asheville-Buncombe Arson Task Force at the time of the incident, obtained a search warrant for the trailer home and obtained approval to move Archie's body. Williams later observed Dr. Jerri McLemore perform an autopsy of Archie's body. Dr. McLemore observed extensive "thermal injuries or thermal changes of the outside of the body" and a carbon monoxide presence in Archie's blood in excess of sixty percent. Dr. McLemore noted that "going over 50 percent" is "basically lethal." Dr. McLemore then made a finding and diagnosis that the ultimate "cause of death was smoke and fume inhalation."

¶ 14    During initial trial proceedings, the trial court judge inadvertently mentioned that Defendant's attorneys were from the public defender's office. The trial judge briefly stated on a single instance, "Ms. McLendon is with the public defender's office also," in front of the jury, but never again made reference to defense counsel's office in front of the jury throughout the remaining proceedings. Defendant's counsel requested the trial court strike the entire jury venire. The trial court denied the motion, unless the parties could show any type of appellate decision showing the identification of public defenders as reversible error. Defendant moved to dismiss the

charges against her for insufficient evidence at the close of the State's evidence and again at the close of Defendant's evidence. The trial court denied both motions.

¶ 15 The jury convicted Defendant on one count of involuntary manslaughter. Because the jury was unable to reach a verdict on Defendant's child abuse charge, the trial court declared a mistrial as to that charge. Defendant orally provided notice of appeal in open court.

## II. Analysis

¶ 16 Defendant raises three issues on appeal. First, Defendant contends that the trial court erred in denying her motion to strike the jury venire, because it denied her right to a fair trial before an impartial jury. Second, Defendant argues that her involuntary manslaughter conviction must be vacated because the State did not meet its burden of proving that Defendant's criminally negligent actions proximately caused Archie's death. Third, Defendant asserts that the short-form indictment charging Defendant with involuntary manslaughter was fatally defective for lack of sufficient notice of involuntary manslaughter's essential elements.

### A. Jury Venire

¶ 17 Defendant challenges the fairness of her trial due to the trial court denying Defendant's motion to strike the jury venire after the trial judge inadvertently mentioned Defendant's counsel was from the public defender's office on a single occurrence prior to jury selection.

¶ 18     "A remark by the court is not grounds for a new trial if, when considered in the light of the circumstances under which it was made, it could not have prejudiced [the] defendant's case." *State v. King*, 311 N.C. 603, 618, 320 S.E.2d 1, 11 (1984). The defendant "bears the burden of establishing that the trial judge's remarks were prejudicial." *State v. Summerlin*, 98 N.C. App. 167, 174, 390 S.E.2d 358, 361 (1990) (citing *State v. Blackstock*, 314 N.C. 232, 333 S.E.2d 245 (1985)). "[I]n a criminal case it is only when the jury may reasonably infer from the evidence before it that the trial judge's action intimated an opinion as to a factual issue, the defendant's guilt, the weight of the evidence or a witness's credibility that prejudicial error results." *State v. Blackstock*, 314 N.C. 232, 236, 333 S.E.2d 245, 248 (1985).

¶ 19     The single passing reference made under these facts does not warrant a new trial. The jury could not reasonably infer the trial court's introduction of the parties to be an opinion on a factual issue in the case, Defendant's guilt, nor the weight of the evidence or a witness's credibility. *See id.* Defendant speculates that the status of a public defender may prejudice a defendant, citing only a single law review article to support this assumption. Regardless, it is apparent from the Record that the jury participated in reasoned decision-making based on the merits of the case, as the jury convicted Defendant of involuntary manslaughter but failed to convict on felonious negligent child abuse, prompting a mistrial as to the latter charge. Defendant's challenge to the jury venire fails.

## B. Sufficiency of the Evidence

Next, Defendant claims that the State failed to meet its burden of proof that a criminally negligent act by Defendant was the proximate cause of Archie's death. Claiming the State "failed to meet its burden of proof" is synonymous with, and the foundation of, a motion to dismiss for insufficient evidence. N.C. Gen. Stat. § 15A-1227 (2019); *State v. Scott*, 356 N.C. 591, 594, 573 S.E.2d 866, 868 (2002) (stating that "the State has not met this burden" when announcing its holding under N.C. Gen. Stat. § 15A-1227). "Rule 10(a)(3) [of the North Carolina Rules of Appellate Procedure] provides that a defendant preserves all insufficiency of the evidence issues for appellate review simply by making a motion to dismiss the action at the proper time." *State v. Golder*, 374 N.C. 238, 246, 839 S.E.2d 782, 788 (2020). A defendant may properly preserve all issues related to the sufficiency of the evidence for appellate review by making a proper motion to dismiss on those issues at the close of the State's evidence, and by subsequently renewing the motion to dismiss at the close of all evidence in accordance with Rule 10(a)(3). N.C. R. App. P. 10(a)(3).

Here, Defendant properly preserved the issue by moving to dismiss at the close of the State's evidence as well as the close of Defendant's evidence in accordance with Rule10(a)(3). We review the denial of a motion to dismiss for insufficient evidence *de novo*. *State v. Barnett*, 368 N.C. 710, 713, 782 S.E.2d 885, 888 (2016).

"Upon [a] defendant's motion for dismissal, the question for the Court is

whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [the] defendant[] being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). If substantial evidence exists for each essential element and as to the defendant's identity as the perpetrator, "the motion [to dismiss] is properly denied." *Id.* "'[S]ubstantial evidence' . . . mean[s] that the evidence must be existing and real, not just seeming or imaginary." *Id.* at 99, 261 S.E.2d at 117. Put differently, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980).

¶ 23    When the trial court reviews a defendant's motion to dismiss for lack of substantial evidence, the evidence must be viewed "in the light most favorable to the State," giving the State the benefit of all reasonable inferences. *State v. Hill*, 365 N.C. 273, 275, 715 S.E.2d 841, 843 (2011) (citation and internal quotation marks omitted). Contradictions or discrepancies in the evidence "are for the jury to resolve[.]" *Id.* "[T]he trial court is concerned only with sufficiency of the evidence to carry the case to the jury and not its weight." *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996). The "combination of direct and circumstantial evidence" may be used in reviewing a trial court's assessment of sufficiency of the evidence to survive a defendant's motion to dismiss. *State v. Blagg*, 377 N.C. 482, 490, 858 S.E.2d 268,

274 (2021).

¶ 24        Because Defendant does not contest her identity as the principal actor in the events leading up to Archie's death, we do not review whether there is substantial evidence on the record as to Defendant's identity. This Court's inquiry now turns to the issue of whether there is "such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion" of guilt for each essential element of involuntary manslaughter. *Smith*, 300 N.C. at 78, 265 S.E.2d at 169. "The elements of involuntary manslaughter are: (1) an unintentional killing; (2) proximately caused by either (a) an unlawful act not amounting to a felony and not ordinarily dangerous to human life, or (b) culpable negligence." *State v. McGee*, 234 N.C. App. 285, 289, 758 S.E.2d 661, 664–65 (2014) (citation and internal quotation marks omitted). Culpably negligent acts and culpable omissions to perform a legal duty are both equally sufficient to satisfy the second element of proximate cause. *State v. Everhart*, 291 N.C. 700, 702, 231 S.E.2d 604, 606 (1977). Defendant concedes Archie's death was unintentional and "tragic," but contests the sufficiency of the State's evidence for element two. For the reasons discussed below, we hold that there is substantial evidence in the Record that Defendant's culpably negligent acts and omissions proximately caused Archie's unintentional death and that the evidence was sufficient to send the case to the jury. The trial court did not err when it denied Defendant's motion to dismiss.

1. *Substantial evidence exists to support a reasonable finding that Defendant's acts and omissions were culpably negligent.*

"[C]ulpable negligence . . . must be such reckless or careless behavior that the act imports a thoughtless disregard of the consequences of the act or the act shows a heedless indifference to the rights and safety of others." *State v. Debiase*, 211 N.C. App. 497, 505, 711 S.E.2d 436, 442 (2011) (quoting *State v. Everhart*, 291 N.C. 700, 702, 231 S.E.2d 604, 606 (1977)).

While "citizens generally have no duty to come to the aid of one who is injured" or otherwise in harm's way, "once [a] defendant [makes] efforts to aid the victim, he [is] under a duty to do so with due caution." *In re Z.A.K.*, 189 N.C. App. 354, 358–59, 657 S.E.2d 894, 896–97 (2008). For example, this Court found that an instance when a land owner gave misleading directions to emergency services, thereby delaying possible rescue, was "evidence that [the] defendant[] did not use ordinary care." *Hawkins v. Houser*, 91 N.C. App. 266, 270, 371 S.E.2d 297, 299 (1988). In another case, *In re Z.A.K.*, this Court found a "defendant's actions were even more egregious than [*Hawkins*,]" when, "[a]fter the victim first became ill . . .[,] [the] defendant *lied* to his father, telling him that everything was fine and sending him away." *In re Z.A.K.*, 189 N.C. App. at 360, 657 S.E.2d at 897 (emphasis added). This Court held "[a]t the very least, [the defendant's] affirmative conduct precluded any other rescuer from rendering the aid allegedly necessary to prevent [the victim's] . . . injuries. At

the worst, it actively caused her death." *Id.* (citation omitted).

¶ 27          Here, there is substantial evidence sufficient for a reasonable juror to find that Defendant was culpably negligent in her rescue attempts. Specifically, Defendant admitted that she could have removed Archie from the burning home when Defendant exited to retrieve water from outside. Additionally, and similar to *In re Z.A.K.*, there is substantial evidence from which a reasonable juror could conclude that Defendant's omissions to her neighbors and the firefighters regarding Archie's presence in the burning home "[a]t the very least . . . precluded any other rescuer from rendering the aid allegedly necessary to prevent [the victim's] . . . injuries. At the worst, it actively caused [the victim's] death." *Id.* (citation omitted). Defendant stating "[t]he kids are with their daddy" and failing to mention Archie in any way could lead a reasonable juror to conclude Defendant was culpably negligent in her rescue attempts. This Court "is concerned only with sufficiency of the evidence to carry the case to the jury and not its weight." *Crawford*, 344 N.C. at 73, 472 S.E.2d at 925.

¶ 28          In addition to substantial evidence of Defendant's culpably negligent rescue attempts, there is substantial evidence in the Record that Defendant took more Xanax in a day than Defendant's prescription directed. There is also substantial evidence in the Record that Defendant was aware she was designated as the caretaker for Archie the morning of Archie's death, because she took time off from

work to do so. Taking a higher than prescribed dose of Xanax in anticipation of

serving as Archie's caretaker was a risk-creating behavior. This Court has stated,

> Risk-creation behavior thus triggers duty where the risk is
> both unreasonable and foreseeable. . . . The orbit of the
> danger as disclosed to the eye of reasonable vigilance [is]
> the orbit of the duty. A duty arises based on evidence
> showing that a defendant should have recognized that [a
> victim], or anyone similarly situated might be injured by
> their conduct.

*In re Z.A.K.*, 189 N.C. App. at 359, 657 S.E.2d at 897. As Archie's intended caretaker

for the morning of his death, and as a creator of risk by over-consuming Xanax,

Defendant had duties to Archie.

It is not this Court's duty to weigh the evidence or pinpoint where a reasonable

jury must have concluded culpable negligence was manifest. It is sufficient to say

there was substantial evidence to allow the jury to determine the presence of acts or

omissions adequate to satisfy the culpable negligence element of involuntary

manslaughter.

> 2. *Substantial evidence exists to support a finding that Defendant's culpably
>    negligent acts proximately caused Archie's death.*

Proximate cause is a cause "from which any man of ordinary prudence could

have foreseen that such a result was probable under all the facts as they existed."

*State v. Cole*, 343 N.C. 399, 416, 471 S.E.2d 362, 370 (1996) (quoting *State v. Powell*,

336 N.C. 762, 771, 446 S.E.2d 26, 31 (1994)). "Foreseeability is an essential element

of proximate cause." *Id.* The defendant need not actually foresee the precise injurious outcome, but "in the exercise of reasonable care, [if] the defendant might have foreseen . . . [some] consequences of a generally injurious nature" the cause may be deemed sufficiently foreseeable to be a proximate cause. *Id.* Giving the State the benefit of all reasonable inferences, there was substantial evidence from which a reasonable juror could conclude that Defendant's culpably negligent acts proximately caused Archie's death.

¶ 31         The Record tended to show that Archie was alive during the fire. Archie's airway was coated with soot, and his blood contained a lethally high level of carbon monoxide in excess of sixty percent. "That's one indication that [Archie] was alive at the time of the fire" and "there had to have been active breathing [by Archie]." There was evidence that Archie was located "on [his] back on the floor" during the fire, when "the carbon monoxide and the smoke[] fumes tend[] to rise." Further evidence in the Record indicates that "there was at least some period of time . . . that [Archie] would have been alive during the course of the fire."

¶ 32         Assuming all inferences in favor of the State, there is substantial evidence in the Record sufficient for a reasonable juror to conclude that a person "in the exercise of reasonable care" would have foreseen Archie's potential injury or death resulting from Defendant's failure to remove Archie from the burning home with Defendant upon her exiting the home. *Cole*, 343 N.C. at 416, 471 S.E.2d at 370. Additionally,

there is substantial evidence that a reasonable person would foresee that stating "[t]he kids are with their daddy" while failing to mention Archie's presence in the fire to anyone would likely stifle potential rescue attempts, thereby causing injury or death. Furthermore, there is substantial evidence that Archie was alive during Defendant's exit from the home and for some time as the fire escalated, due to the soot in Archie's airway and carbon monoxide in Archie's blood. While the specific moment of death is uncertain, there was substantial evidence of foreseeability and causation which was properly weighed by the jury to determine the element of proximate cause.

¶ 33        For the foregoing reasons, the trial court did not err when it denied Defendant's motion to dismiss for insufficient evidence.

## C. Indictment Sufficiency

¶ 34        Defendant asserts for the first time on appeal that Defendant's short-form indictment for involuntary manslaughter was fatally flawed for insufficiently alleging the essential elements of the offense, thereby denying the trial court jurisdiction to hear the proceeding. Typically, "[a] defendant waives an attack on an indictment when the validity of the indictment is not challenged in the trial court." *State v. Braxton*, 352 N.C. 158, 173, 531 S.E.2d 428, 437 (2000). However, "[w]here an indictment is alleged to be invalid on its face, thereby depriving the trial court of its jurisdiction, a challenge to that indictment may be made at any time, even if it

was not contested in the trial court." *State v. Williams*, 368 N.C. 620, 622, 781 S.E.2d 268, 270 (2016) (citation and internal quotation marks omitted). When "[t]he alleged failure of a criminal pleading to charge the essential elements of a stated offense" is made, as Defendant does in this appeal, the alleged failure "is an error of law that this Court reviews de novo." *Id.*

N.C. Gen. Stat. § 15-144 states in pertinent part that "it is sufficient in describing manslaughter to allege that the accused feloniously and willfully did kill and slay [the alleged victim], and concluding as aforesaid." N.C. Gen Stat. § 15-144 (2019). The constitutionality of this statutory short-form indictment has been upheld by this Court and our Supreme Court, a point which Defendant concedes. *Braxton*, 352 N.C. at 174–75, 531 S.E.2d at 437–38; *State v. Reynolds*, 160 N.C. App. 579, 583, 586 S.E.2d 798, 801 (2003). Accordingly, this Court must sustain the sufficiency of the indictment.

## III.    Conclusion

For the foregoing reasons, we hold Defendant received a fair trial, free from error.

NO ERROR.

Judges ARROWOOD and CARPENTER concur.