STATE OF NORTH CAROLINA
v.
STEVEN RODNEY PAULEY.
No. COA09-364.
Court of Appeals of North Carolina.
Filed October 20, 2009.
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General Kathleen M. Waylett, for the State.
Appellate Defender Staples Hughes, by William B. Gibson, for Defendant.
ERVIN, Judge.
Defendant appeals from judgments entered based upon jury verdicts convicting him of two counts of robbery with a dangerous weapon, a single count of conspiracy to commit armed robbery, and two counts of second-degree kidnapping. After careful consideration of the evidentiary record in light of the applicable law, we conclude that Defendant received a fair trial free from prejudicial error and that the judgments entered by the trial court should remain undisturbed.

Substantive Factual Background
At trial, the State presented evidence tending to show that Filma Cruz (Cruz), Shwanna Alexander (Alexander), and Daniel Lattimore (Lattimore) worked together at Cash America Pawn in Mecklenburg County. Lattimore worked as Cash America's assistant manager, while Alexander and Cruz served as customer service representatives.
Alexander, Cruz, and Lattimore were all at work at Cash America on the morning of 21 July 2007. At 9:00 a.m., Cash America opened for business. A customer named Donald Mills (Mills) entered the store at about the time that it opened. Shortly after the store opened, Alexander and Lattimore went to the rear of the building to prepare merchandise for customers, while Cruz remained out front.
At approximately 9:15, Mills left the store. As Mills exited the building, "someone grabbed him." According to Cruz, two masked African-American men, one of whom grabbed Mills, entered the store. As one of the two men held Mills, the other "walked over to the jewelry cases."
The man who held Mills "[had] his face covered with a red thing." He approached Cruz "point[ing] [a] gun" and asking "where [are] the others[;] where [are] the others." Cruz replied that her coworkers were "in the back" of the store.
Alexander testified that, by looking through the windows in the doors leading to the rear area, she saw the two men enter the store. According to Alexander, the two men held guns in their hands and brought Mills back into the store. Alexander described one of the two men, whom she estimated to be in his "early twenties," as wearing a red "fitted" cap, a black "scarf" of "the kind [that] you [would] tie on your head[,]" and a long-sleeved sweatshirt that might have been "gray or white" and described the other man as having dredlocks. Alexander stated that neither robber was wearing gloves. Alexander did not see the face of either of the individuals who entered Cash America that morning.
While the first man held Cruz at gunpoint, the second examined the jewelry cases. While being held at gunpoint, the other man "broke the jewelry cases" with a "piece of iron." The man holding Mills then demanded that Cruz "open the drawers where [you] have the money." Although Cruz complied, she surreptitiously pushed a button beneath the counter in order to alert the police. After taking the money from the drawer, the man who had been holding the gun on her demanded that Cruz "go on the floor with [your] face down[,]" which she did.
Because she was lying on the floor, Cruz did not see what happened next. However, Cruz knew that one or both men entered the rear of the building, where Alexander and Lattimore had been preparing merchandise for customers, and remained in that location for approximately three minutes. Cruz stayed on the floor until the two men left.
After Alexander saw the men enter the store, she warned Lattimore that a robbery was in progress. As Alexander was attempting to alert her co-worker to the presence of the robbers, "the guy came behind me with the gun behind my head and I ended up getting on the ground." At that point, the man left her on the floor and confronted Lattimore, telling him to "get the money out of the safe[.]"
After seeing the "individual behind [Alexander] waving a gun [and] telling us to get down[,]" Lattimore "immediately hit the floor." The man approached Lattimore and "[p]ointed to the safe to see if we had any money in it." Lattimore opened the safe and showed the intruder that "there was no money" in it. After ascertaining that the safe did not contain any cash, the man checked Lattimore's wallet, "took" Lattimore "back out[,] [and] [h]ad [him] lay (sic) down in the processing room floor." Lattimore described the man as "wearing black and red" and having a "covered" face. Lattimore testified that the first man wore a "red bandana" and that the other man was wearing a "white shirt."
After spending approximately ten minutes in the store, the two men left after taking sixty to one hundred pieces of jewelry from the jewelry cases and money from the cash register. Shortly after the two men departed, the police arrived and began to search for the suspects. The three eye-witnesses gave the following description of the suspects to Officer Gary Whitt (Officer Whitt):
The clothing description on one was white T-shirt and dark pants. He had on some type of head covering. I don't remember if it was red or blue but there was a color description on it. The other black male had on black pants and a black T-shirt and also a head covering. And both of them had dark colored handguns.
According to a statement that she gave to Officer Whitt on the day of the robbery, Cruz described one man as wearing a "black T-shirt, [and] a red toboggan." In his statement, Lattimore described one of the men as wearing "a black T-shirt and a red covering over his head" and the other one as wearing "a white shirt" and as having "a black covering over his head." According to Alexander's statement, "one of them had on a red fitted hat[,]" and the other one wore a "[b]lack ski mask[.]"
Shortly after the robbery, Officer David Jester (Officer Jester) learned of the events at Cash America. At trial, Officer Jester testified that:
I was actually parked at [an] intersection, at a traffic light, when I saw a dark blue Cadillac approaching the intersection[.] . . . The description we were given was a . . . dark or black Cadillac with a thirty day tag . . . with two black males with dredlocks. . . . As [the car] crossed the intersection I immediately noticed that two black males were in the Cadillac. It was actually dark blue and that both [men] had dredlocks, two black males. As they crossed the intersection they both looked at where I was stopped at the intersection. As the car crossed over the intersection I noticed it had a thirty day tag. . . . [They looked] [a]t me. . . . [They were] kind of a oh, no, because I was sitting right there. . . . I entered the intersection. Turned behind them. . . . They were in the right-hand lane. It was a four-lane roadway. . . . I jumped in right behind him and gave out the description of what I was behind, possible suspect vehicle, gave the tag number. And as soon as I got in behind him he immediately jumped into the left-hand lane and began going towards the 277 exit. . . . Got over to the lane to get on to 277, the John Belk Freeway. I immediately jumped in behind him in my patrol car. He went to get off on to 277 and immediately made a U-turn around the median at that intersection and headed back in the direction he was coming from[.] .. . It left at a high rate of speed. . . . I immediately followed[.] . . . [The Cadillac then] ran a red light[,] . . . [and] that's when I initiated [the] blue lights and siren which began a chase.
At the conclusion of a high speed chase, during which the fleeing vehicle continued to increase speed, the Cadillac "hit a piece of furniture or something that was in the roadway[,] . . . which caused [the driver] to lose control [of the car,]" and collided with a tree.
When Officer Jester arrived at the scene of the wreck, he saw that "the driver's door and the passenger door were open" and that two "black males with dredlocks" "were both standing right in front of the vehicle." One of the black males standing in front of the Cadillac "was wearing a white T-shirt and [the other] was wearing a black T-shirt." As soon as Officer Jester began to approach them, the two suspects "immediately took off running." Officer Jester caught "the one in the black T-shirt" after he stumbled while jumping a fence. Officer Jester identified Defendant as the man he caught on this occasion. The man in the white T-shirt, who was later identified as an individual named Mervin Meeks (Meeks), was apprehended "one street over." Jewelry and $400 in cash were seized from Meeks' person; Meeks subsequently pled guilty to robbing Cash America. No jewelry or cash was found on Defendant.
Officer Christopher Busic (Officer Busic) arrived at the scene of the collision shortly after it occurred. Officer Busic testified that he saw "a bag" in the Cadillac. Officer Scott Gerson searched the "duffel bag" and found jewelry with attached "Cash America" tags and items used to display jewelry inside it. In addition, Officer Busic discovered "a gold ring" and a handgun in the floorboard of the wrecked Cadillac. The police never located a second firearm.
Investigator Kristine Woodhouse (Investigator Woodhouse) searched the wrecked Cadillac. While searching the Cadillac, Investigator Woodhouse seized "a black handgun[;] a red knit hat with a rolled up brown cotton glove[;]" "a green washcloth[;]" "a cell phone[;]" "a green bag containing . . . jewelry, . . . [burgundy] jewelry stands, display cases[,] and [broken] glass[;]" "a green bandana[;]" "a pair of brown cotton gloves[;]" "a pair of jeans[;]" a "dirty white T-shirt[;]" "a dirty white towel[;]" and "loose jewelry . . . scattered on the floorboard."
According to Detective Randy Carroll (Detective Carroll), fingerprints were recovered from the Cadillac, but not from the Cash America store. After reviewing a surveillance video received from the store, Detective Carroll determined that the "suspects were wearing gloves during the time of the robbery."
At trial, Defendant presented the testimony of Meeks and testified on his own behalf. Although Meeks admitted his own involvement in the robbery, he claimed that an individual known as "T" or "Trey" had helped him rob the Cash America store instead of Defendant. According to Meeks, both he and Trey were under the influence of alcohol and drugs on 21 July 2007. Meeks claimed that, when he and Trey entered the Cash America store, Trey had "a little black pistol" and he had a tire iron. As they came into the Cash America building, Trey encountered Mills, backed him into the store, and "pushed him down on the floor." After Meeks smashed the jewelry cases with the tire iron, both he and Trey loaded the jewelry into a bag. In addition to taking jewelry from the smashed cases, Meeks admitted that he and Trey obtained some cash during the robbery as well. As he and Trey were driving away from Cash America, they saw Defendant near Ashley Road and Freedom Drive, stopped, and gave him a ride. As soon as Trey noticed the police, they "went on a high speed chase," which ended in a wreck, after which "everybody jumped out and ran in separate ways." Upon being taken into custody, Meeks claimed to have informed investigating officers that Defendant was not involved in the robbery.
Defendant testified that, while he was walking from his home to a nearby neighborhood, a car driven by an individual named "Trey Adams" stopped near the intersection of Ashley Road and Freedom Drive and offered him a ride. On the date in question, Defendant was under the influence of drugs and was wearing black shorts and a black t-shirt. After he got into the back seat, Meeks and Trey told Defendant that they were "hot." After the police car got behind the vehicle in which he was riding, Defendant testified that he "kind of like scooted down." Since he was "paranoid and high," Defendant admitted running from the police until he was ordered to get down on the ground. Defendant admitted that he told investigating officers that Meeks had gone into the store with a gun, since he "was willing to say anything not to get charged." He also admitted giving conflicting accounts as to whether an individual named Trey was involved, explaining his inconsistent statements on this subject stemmed from his desire to avoid being killed for "snitching on Trey."
In rebuttal, Detective Carroll testified that he interviewed both Meeks and Defendant on 21 July 2007. According to Detective Carroll, Meeks never mentioned Trey or said that he had been involved in the Cash America robbery. In fact, Meeks claimed that he had just been picked up by the occupants of the Cadillac shortly before the wreck and that the presence of jewelry and money on his person at the time of his arrest stemmed from the fact that he had purchased the jewelry from the driver of the Cadillac and had earned the money selling drugs. Although Detective Carroll acknowledged that Defendant did mention Trey's involvement, he described Defendant's description of Trey's participation in the events that allegedly occurred on 21 July 2007 as inconsistent. According to Detective Carroll, Defendant was distraught and repeatedly said that he was trying to get something to give to his daughter for her birthday on the date in question. In addition, after Detective Carroll told Defendant that he had received statements from the employees at Cash America and that only two persons participated in the robbery, Defendant apologized to Detective Carroll for lying and admitted that there was no third person. Detective Carroll never made any effort to determine Trey's identity or to investigate Defendant's claim that Trey had participated in the robbery.

Procedural History
On 21 July 2007, Magistrate's Orders were issued charging Defendant with robbery with a dangerous weapon, second-degree kidnapping, and conspiracy to commit robbery with a dangerous weapon. On 13 August 2007, the Mecklenburg County grand jury returned bills of indictment charging Defendant with two counts of robbery with a dangerous weapon  one count directed to the alleged robbery of Cash America and the second directed to the alleged robbery of Lattimore; two counts of second-degree kidnapping  one count directed to the alleged kidnapping of Lattimore and the second count directed to the alleged kidnapping of Mills; and one count of conspiracy to commit armed robbery. The charges against Defendant came on for trial at the 12 January 2009 session of the Mecklenburg County Superior Court. On 16 January 2009, the jury found Defendant guilty as charged. On the same date, the trial court entered a judgment in which it consolidated Defendant's convictions for two counts of robbery with a dangerous weapon and two counts of second-degree kidnaping for judgment, determined that Defendant should be sentenced as a Level V offender based upon the accumulation of 18 prior record level points, and sentenced Defendant to a minimum of 133 months and a maximum of 169 months imprisonment in the custody of the North Carolina Department of Correction. In addition, the trial court entered a separate judgment in the case in which Defendant was convicted of conspiracy to commit robbery with a dangerous weapon in which he also found Defendant to be a Level V offender based upon the accumulation of 18 prior record level points and sentenced defendant to a minimum of 53 months and a maximum of 73 months imprisonment in the custody of the North Carolina Department of Correction, with this sentence to be served at the expiration of the sentence imposed based upon Defendant's convictions for robbery with a dangerous weapon and second-degree kidnapping. From these judgments[1], Defendant has appealed to this Court.

Analysis

Standard of Review:
On appeal, Defendant first contends that the trial court erred by denying his motions to dismiss the robbery with a dangerous weapon, second-degree kidnapping and conspiracy to commit robbery with a dangerous weapon charges for evidentiary insufficiency. In ruling on such a dismissal motion, the trial court need only determine "whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." State v. Crawford, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996) (citing State v. Vause, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991)). "`Substantial evidence' is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion." State v. Abshire, 363 N.C. 332, 328, 677 S.E.2d 444, 449 (2009) (citing State v. McNeil, 359 N.C. 800, 804, 617 S.E.2d 271, 274 (2005)). "In [making] this determination, all evidence is considered `in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence.'" Abshire, 363 N.C. at 328, 677 S.E.2d 1t 449 (quoting McNeil, 359 N.C. at 804, 617 S.E.2d at 274). Additionally, an "evidentiary insufficiency" inquiry "examines the sufficiency of the evidence presented but not its weight," which is a matter for determination by the jury and not by a reviewing court. McNeil, 359 N.C. at 804, 617 S.E.2d at 274. "[I]f there is substantial evidence  whether direct, circumstantial, or both  to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." Id. (citations omitted). However, if the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed[.]" State v. Malloy, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

A: Identity
First, Defendant contends that the trial court erred by denying his motion to dismiss all of the charges lodged against him. More specifically, Defendant challenges the sufficiency of the evidence to support a determination that he was one of the perpetrators of the crimes committed at the Cash America store on 21 July 2007. After carefully reviewing the evidentiary record, we disagree with Defendant's contention.
The State presented substantial evidence tending to show that Defendant was one of the two individuals that conspired to rob the Cash America store and committed the robberies and kidnappings that the jury found to have occurred at that location on 21 July 2007. For example, the record clearly reflects that Defendant was apprehended in the same general vicinity and under the same general circumstances as Meeks, who admitted his participation in the Cash America robbery. Defendant and Meeks were spotted by Officer Jester in a Cadillac that matched the description of the vehicle in which the suspects were riding provided by the victims of the Cash America robbery. Officer Jester first observed the Cadillac a relatively short distance from the Cash America store and only minutes after the robbery. When the occupants of the Cadillac saw Officer Jester, they fled and initiated a high-speed car chase, which ended when the Cadillac collided with a tree. According to Officer Jester, there were only two people in the Cadillac. Defendant's fingerprints were found on the exterior window trim of the Cadillac's front left door. Officer Jester testified that he reached the vehicle within seconds after it crashed. At the time of his arrival at the scene of the wreck, Officer Jester observed that the driver's and front passenger doors were open and that Defendant and Meeks were standing beside the vehicle. Officer Jester denied seeing a third person at the accident scene. At the time he was apprehended, Defendant was wearing clothing consistent with that described by the employees of Cash America and depicted on the surveillance tape. The items found in the Cadillac by investigating officers were generally consistent with the information provided by Cash America employees concerning the clothing worn by the perpetrators of the robbery and the items taken from the store.
In addition, the record contains evidence of statements made by Defendant to investigating officers that could be construed as an admission of involvement in the Cash America robbery. Defendant told investigating officers inconsistent stories about Trey's alleged involvement in the Cash America robbery. In addition, Detective Carroll testified that, during his interrogation of Defendant, Defendant admitted that "there was no third person. I'm sorry I lied to you." Defendant also conceded during his own testimony that he had backed off his claim that Trey had participated in the Cash America robbery during his conversation with Detective Carroll, although he explained this change of story by stating that, "after I thought about it[,] I didn't want to be the one" to tell the police about Trey because "[i]t wouldn't be safe for me." Finally, Defendant told Detective Carroll that Meeks had the gun during the robbery. Thus, the record reflects that Defendant made a number of statements that could be construed as admissions of involvement in the robbery of and kidnappings at the Cash America store on 21 July 2007.
Although the evidence before the jury was in conflict, those conflicts were for resolution by the jury. When considered in the light most favorable to the State and when the State is given the benefit of every reasonable inference arising from the evidence, we conclude that the record contains substantial evidence tending to support a finding that Defendant was the perpetrator of the crimes for which he was convicted in these cases. When taken in the light most favorable to the State, the evidence tends to show that two, and only two, people perpetrated the Cash America robbery; that two, and only two, people, were observed in the Cadillac shortly after the Cash America robbery; that two, and only two, people, one of whom was Defendant, were in the vicinity of the Cadillac after it wrecked; that Defendant was apprehended running from the Cadillac, from which considerable evidence linking that vehicle to the Cash America robbery was retrieved; and that Defendant made a number of inculpatory statements tending to suggest that he was, in fact, involved in the Cash America robbery. As a result, we conclude that the trial court did not err by denying Defendant's motions to dismiss the charges against him for lack of sufficient evidence to support a jury finding that Defendant was, in fact, the perpetrator of the crimes committed in connection with the Cash America robbery. Thus, this assignment of error is overruled.

B: Second-Degree Kidnapping of Lattimore
Secondly, Defendant contends that the trial court erred by refusing to dismiss the case in which he was charged with second-degree kidnapping of Lattimore for evidentiary insufficiency. After a careful review of the evidentiary record in light of the applicable law, we conclude that the trial court correctly denied Defendant's dismissal motion.
N.C. Gen. Stat. § 14-39 provides that:
(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:
. . . .
(2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony[.]
N.C. Gen. Stat. § 14-39(a)(2). In the event that the victim is released in a safe place and is neither seriously injured nor sexually assaulted, the defendant is guilty of second-degree rather than first-degree kidnapping. N.C. Gen. Stat. § 14-39(b). Defendant's challenge to the sufficiency of the evidence to support his conviction for second-degree kidnapping of Lattimore rests upon his contention that the record does not contain any evidence tending to show that Lattimore was subject to any confinement, restraint or removal separate and apart from any confinement, restraint, or removal inherent in the commission of a robbery of Cash America or of Lattimore with a dangerous weapon.
"`[C]ertain felonies (e.g., forcible rape and armed robbery) cannot be committed without some restraint of the victim.'" State v. Ripley, 360 N.C. 333, 337, 626 S.E.2d 289, 292 (2006) (quoting State v. Fulcher, 294 N.C. 503, 523-24, 243 S.E.2d at 338, 351-52 (1978). The degree of restraint which is an inherent, inevitable component of the commission of a felony such as armed robbery is not sufficient, standing alone, to also sustain a separate conviction for kidnapping. See State v. Irwin, 304 N.C. 93, 102-103, 282 S.E.2d 439, 446 (1981). As a result, in order to support a conviction for kidnapping in conjunction with a conviction for another offense which also inherently involves some sort of confinement, restraint, or removal, there must be a "removal separate and apart from that which is an inherent, inevitable part of the commission of another felony." Irwin, 304 N.C. at 103, 282 S.E.2d at 446. "To permit separate and additional punishment where there has been only a technical asportation, inherent in the other offense perpetrated, would violate a defendant's constitutional protection against double jeopardy." Id.
In an armed robbery, for example, punishment for two offenses would be sanctioned if the victim was forced to walk a short distance towards the cash register or to move away from it to allow defendant access. Under such circumstances the victim is not exposed to greater danger than that inherent in the armed robbery itself, nor is he subjected to the kind of danger and abuse the kidnapping statute was designed to prevent.
Id. (citation omitted); see also Ripley, 360 N.C. at 340, 626 S.E.2d at 294 (holding that "a trial court must consider additional factors such as whether the asportation facilitated the defendant's ability to commit a felony offense") (emphasis added); Irwin, 304 N.C. at 103, 282 S.E.2d at 446 (insufficient evidence to support a kidnapping conviction when the defendant forced an employee at knifepoint, during an attempted armed robbery, to walk from the front cash register to the back of the store where the prescription counter and the safe were located). On the other hand, where the confinement, restraint, or removal of the victim is separate and apart from that inherent in the commission of another felony, N.C. Gen. Stat. 14-39(a) allows the defendant to be convicted and punished for both crimes. See State v. Newman, 308 N.C. 231, 302 S.E.2d 174 (1983) (holding that "[r]emoval of [the victim] from her automobile to the location where the rape occurred was not such asportation as was inherent in the commission of the crime of rape[;] [r]ather, it was a separate course of conduct designed to remove her from the view of a passerby who might have hindered the commission of the crime" and was "sufficient to sustain a conviction of kidnapping"). Thus, the fundamental issue raised by Defendant's challenge to his conviction for the second-degree kidnapping of Lattimore is whether the evidentiary record supports a finding that any confinement, restraint, or removal to which Lattimore was subjected was inherent in the process of the commission of a robbery with a dangerous weapon or whether he was subject to a separate and independent confinement, restraint, or removal.
This Court has sustained kidnapping convictions on the basis of the following factual analysis:
[T]he perpetrators, including defendant, forced the victims at gunpoint to walk from the front of the store some thirty to thirty-five feet to a dressing room in the rear where they bound them with tape and robbed both them and the store. Since none of the property was kept in the dressing room, it was not necessary to move the victims there in order to commit the robbery. Removal of the victims to the dressing room thus was not an inherent and integral part of the robbery. Rather, as in Newman, it was a separate course of conduct designed to remove the victims from the view of passersby who might have hindered the commission of the crime. The evidence thus was sufficient under [N.C. Gen. Stat. §] 14-39 to sustain the kidnapping convictions, and the court properly denied defendant's motion to dismiss the kidnapping charges.
State v. Davidson, 77 N.C. App. 540, 543, 335 S.E.2d 518, 520 disc. review denied and appeal dismissed, 314 N.C. 670, 337 S.E.2d 583 (1985). In this case, the perpetrator initially told Lattimore to drop to the floor at the bottom of the stairs. Subsequently, Lattimore was ordered to go to the store safe and open it. The safe was some twelve feet away from the bottom of the stairs in the processing room area. After Lattimore went to the safe and ascertained that there was no money there, the perpetrator moved Lattimore back to the processing room and forced him to lie on the floor. The record does not contain any evidence tending to show that any property was taken from the processing room, although the perpetrator did check Lattimore's wallet. On the one hand, we believe that the act of moving Lattimore to the safe for the purpose of ascertaining whether it contained any money was an integral part of the armed robbery of the Cash America store. See Irvin, 304 N.C. at 103, 282 S.E.2d at 446 (insufficient evidence to support a kidnapping conviction when the defendant, in the course of attempting to commit an armed robbery, forced an employee at knifepoint to walk from the front cash register to the back of the store where the safe was located). On the other hand, the act of returning Lattimore to the processing room and requiring him to lie on the floor after the discovery that there was no money in the safe did nothing to facilitate the commission of a robbery with a dangerous weapon. On the contrary, it was completely unnecessary for the perpetrator of the Cash America robbery to move Lattimore from the safe back to another part of the processing room in order to rob the Cash America store or take money from his wallet. See State v. Whittington, 318 N.C. 114, 122, 347 S.E.2d 403, 408 (1986) (stating that "[a]sportation of the victim was not a necessary element of the sexual assault[;] Defendant could have perpetrated the offense when he first threatened the victim[,] [but] [i]nstead, he chose to remove the victim away from a brightly lit area, near houses and the highway, to a darker, more secluded area"). For that reason, consistently with our decision in Davidson, 77 N.C. App. 540, 335 S.E.2d 518, we conclude that the asportation of Lattimore from the vicinity of the safe was not an integral part of the commission of a robbery with a dangerous weapon and did not facilitate the perpetrator's ability to commit that offense. Thus, Lattimore's removal from the safe to another part of the processing room was a separate and distinct event from the robbery with a dangerous weapon of both Cash American and Lattimore, so that the trial court did not err by refusing to dismiss the charge of second-degree kidnapping of Lattimore for evidentiary insufficiency. This assignment of error is overruled.

C: Second-Degree Kidnapping of Mills
Finally, Defendant contends that the trial court erred by denying his motions to dismiss the charge of second-degree kidnapping of Mills for evidentiary insufficiency. Once again, Defendant challenges the sufficiency of the evidence to support a finding that the confinement, restraint or removal of Mills was a separate and complete act independent of and apart from the commission of a robbery with a dangerous weapon. As was the case with Defendant's similar challenge to his conviction for the second-degree kidnapping of Lattimore, we conclude that the record contains sufficient evidence to support Defendant's conviction for the second-degree kidnapping of Mills.
As we have already noted, a conviction for kidnapping in addition to a conviction and punishment for a separate and distinct felony arising from the same basic set of facts requires proof of a "removal separate and apart from that which is an inherent, inevitable part of the commission of another felony." Irwin, 304 N.C. at 103, 282 S.E.2d at 446. In this case, we conclude that the Supreme Court's decision, State v. Boyce, 361 N.C. 670, 674, 651 S.E.2d 879, 883 (2007), requires us to uphold Defendant's conviction for second-degree kidnapping of Mills. In Boyce, the Supreme Court stated that:
The State's evidence in the present case sufficiently established that defendant prevented the victim's escape by pulling her back into her residence before the onset of the robbery with a dangerous weapon. This restraint and removal was a distinct criminal transaction that facilitated the accompanying felony offense and was sufficient to constitute the separate crime of kidnapping under North Carolina law.
Boyce, 361 N.C. at 674, 651 S.E.2d at 883. According to the Supreme Court, "[t]hat the victim was removed just a short distance and only momentarily before the robbery is irrelevant, as this Court long ago dispelled the importance of distance and duration." Id., 361 N.C. at 674-75, 651 S.E.2d at 882-83 (citing Fulcher, 294 N.C. at 522, 243 S.E.2d at 351 (stating that "resort to a tape measure or a stop watch [is] unnecessary in determining whether the crime of kidnapping has been committed")). In concluding that the State had adduced sufficient evidence of asportation in Boyce, the Supreme Court emphasized that:
Dunford, home alone and four and a half months pregnant, struggled to prevent [Defendant's] entry by pushing the door shut and biting his hand. Defendant continued to force his way into the residence. Dunford, realizing further resistance was futile, attempted to flee through the rear of the residence. She managed to open the back door and "got a foot out of the house" before defendant prevented her escape by grabbing her shirt. The victim "reached around the door trying to hold [herself] out of the door and trying to escape." She also attempted to escape by trying to remove her shirt, which was still being held by defendant. Again, she was unsuccessful. Given the time of day, Dunford realized neither neighbors nor construction workers typically present in the area were in close enough proximity to hear her yell. She testified she was afraid defendant intended to harm her should she be pulled back into the residence. While defendant held her shirt, the victim repeatedly screamed, "Don't hurt me," and that she was pregnant. Defendant, holding onto Dunford's shirt with his left hand, pulled her back into the interior of the residence. Dunford fell as a result of the force, looked up, and for the first time observed defendant holding a handgun in his right hand.
Id., 361 N.C. at 671-72, 651 S.E.2d at 880-81. As a result, since the defendant had not yet actually begun to rob the victim at the time that he forced his way into the residence and prevented her from escaping from the residence, the Supreme Court concluded that a separate confinement, restraint, or removal sufficient to support a separate kidnapping conviction had occurred.
In this case, Cruz testified that "Mr. Mills walked out [of the pawn shop][.]" Shortly thereafter, Cruz "saw him walking back because somebody took him like this[;] [a] guy . . . grabbed him." Once he had been forced back inside the Cash America store, the suspects forced Mills to lie on the floor. Similarly, Meeks testified on direct examination that, at the time that he and Trey entered the Cash America store, "[t]here was the older guy in front and Trey pushed him down . . . on the floor." We see no substantive difference between the evidence contained in the present record and the evidence before the Supreme Court in Boyce, 361 N.C. 670, 651 S.E.2d 879. In both cases, the alleged victim was forced to remain inside a building by the perpetrator or perpetrators before the actual robbery began. Since Boyce, 361 N.C. 670, 651 S.E.2d 879 clearly states that "[t]his restraint and removal was a distinct criminal transaction . . . and was sufficient to constitute the separate crime of kidnapping under North Carolina law," we conclude that there was sufficient evidence to support Defendant's conviction for the second-degree kidnapping of Mills. As a result, this assignment of error is overruled.

Conclusion
Thus, for the reasons set forth above, we conclude that Defendant's challenges to the sufficiency of the evidence to support his convictions lack merit. For that reason, we find no error in the proceedings at trial and leave the trial court's judgments undisturbed.
NO ERROR.
Judges GEER and STROUD concur.
Report per Rule 30(e).
NOTES
[1] The trial court did not make written findings in aggravation or mitigation in either of the judgments entered against Defendant or specify the basis for its decision not to do so. In view of the fact that the sentence imposed upon Defendant by the trial court in both counts is at the absolute upper end of the presumptive range and the fact that Defendant has not challenged the trial court's failure to make written findings in aggravation or mitigation in its written judgment, we will assume that the trial court intended to impose a sentence in the presumptive range and simply failed to note that fact in entering judgment. We do, however, urge the trial courts to take care in entering judgment in felony cases to either make written findings in aggravation or mitigation or to state the reasons for their failure to do so in writing, such as by checking the appropriate box on the Judgment and Commitment form (AOC-CR-601) indicating that the sentence falls within the presumptive range.