IN THE SUPREME COURT OF NORTH CAROLINA

No. 238A18

Filed 16 August 2019

IN THE MATTER OF T.T.E.[1]

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 818 S.E.2d 324 (N.C. Ct. App. 2018), vacating adjudication and disposition orders entered on 27 February 2017 by Judge Susan M. Dotson-Smith in District Court, Buncombe County. Heard in the Supreme Court on 28 May 2019 in session in the State Capitol Building in the City of Raleigh.

*Joshua H. Stein, Attorney General, by Janelle E. Varley, Assistant Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Heidi E. Reiner, Assistant Appellate Defender, for juvenile-appellee.*

MORGAN, Justice.

This juvenile delinquency case concerns the sufficiency of evidence required to survive a juvenile's motion to dismiss a petition alleging disorderly conduct. In light of the relatively low threshold of evidence needed to send such a matter to the finder of fact, we conclude that the district court here did not err in denying the juvenile's motion to dismiss that charge. Accordingly, we reverse the decision of the Court of Appeals with respect to this issue.

---

[1] Pursuant to North Carolina Rule of Appellate Procedure 3.1(a), we use initials to refer to the juvenile discussed in this opinion.

## *Factual Background and Procedural History*

On 8 November 2016, two juvenile petitions were filed in the District Court, Buncombe County, alleging that the juvenile T.T.E. was delinquent because of his commission of the offenses of (1) disorderly conduct and (2) resisting a public officer. The disorderly conduct petition alleged that the juvenile, a junior at Clyde A. Erwin High School (EHS), "did intentionally cause a public disturbance at [EHS], Buncombe County NC, by engaging in violent conduct. This conduct consisted of throwing a chair toward another student in the school's cafeteria." The petition regarding the allegation of resisting a public officer stated that the juvenile was delinquent as a result of "[f]leeing the scene of a disorderly conduct incident, resisting the officer's attempts to escort him to the office, having to be handcuffed to be safe, and cursing at the officer."

At the adjudication hearing that was conducted on 20 and 23 February 2017, the State called two witnesses. Deputy Mickey Ray of the Buncombe County Sheriff's Office was the school resource officer at EHS on the date of the juvenile's allegedly delinquent behavior. Deputy Ray testified that on the date of the incident giving rise to the juvenile petition, he was in the cafeteria during "Warrior period," a time slot during the school day when students can receive tutoring and "get to just come out and relax a little bit, maybe hang out in the cafeteria, or hang out on other parts of the campus, just to get a little break from everything else." Deputy Ray stated that

he saw the juvenile "pick up a chair and throw it across the cafeteria" before the juvenile ran out of the room. Deputy Ray pursued the juvenile for twenty-five to thirty yards, and once Deputy Ray caught up to the student, the officer grabbed the juvenile while still behind him. In response to Deputy Ray's instruction to "come back with me," the juvenile "resisted," saying, "No. No. No."

Deputy Ray brought the juvenile to the school lobby and searched him, at which point "all the other kids started trying to get involved." According to the officer's testimony, the juvenile was cursing at Deputy Ray, who decided to put handcuffs on the juvenile. Other students also began to yell at the officer, and Deputy Ray felt the need to handcuff and later to arrest one of the students who had tried to involve himself in the situation with the juvenile. When asked, "Based on . . . how the other students reacted" to the juvenile's act of throwing the chair and then resisting Deputy Ray's attempt to stop and question him, whether the incident "in any way disrupt[ed] or disturb[ed] the process of the school," specifically with regard to students' efforts to go to classes, Deputy Ray responded, "Yes, sir. Absolutely."

Upon further examination at trial, Deputy Ray provided additional details about the school cafeteria incident. He related that the juvenile "chucked" the chair underhandly, but he was unable to say whether the juvenile had thrown the chair "at" anyone in particular; however, the juvenile told Deputy Ray that he had thrown the chair at the juvenile's brother—another EHS student—in the course of "playing

or something." Regarding his perception of the juvenile's intent behind the act of throwing the chair, Deputy Ray was asked the following question at trial and responded as follows:

> Q.  Did it appear to you that, based on what you saw with the chair throwing incident, that [juvenile] was playing, or did it seem like something that was a little more violent?
>
> A.  I couldn't really tell, because just like I told you at the beginning, it's just something I ain't never seen before in my 10 years of working as an SR [school resource officer] in the city schools and the county schools. That's the first time I've seen something like that.

On cross-examination, Deputy Ray testified that he did not see any students have to duck or otherwise maneuver to avoid the chair thrown by the juvenile. Deputy Ray also tempered the testimony that he offered on direct examination by stating that he could not definitively say whether the juvenile's actions were actually disruptive to other students as they went to class.

In addition to Deputy Ray's account, the district court also heard testimony from the State's witness Tate McQueen, a history teacher and soccer coach at EHS. McQueen did not see the chair-throwing incident in the cafeteria but did observe Deputy Ray pursuing the juvenile after the occurrence. McQueen followed Deputy Ray in order to provide assistance as the situation unfolded. At trial, McQueen offered his description of what he observed:

When I rounded the corner from the main foyer to the language arts, or foreign language hall, I observed Officer Ray with a student. At that time, the student was pulling away from Officer Ray. I did not see the moment in which they first came in contact. I observed Officer Ray telling the student to come with him. The student was pulling away.

And as the student and Officer Ray were coming back into the main foyer towards the office, we had a significant safety issue with students gravitating towards that situation. Officer Ray was trying to deal with one student, and there were, I would say, three, four, upwards of five students that were now engaging in this process. Others were stopping instead of going to class. Once that release bell rings, they have about five minutes to get to class. If you've been to Erwin, you know how expansive our building is, so if they are not moving, they are going to be late for class. They will be late for instruction. At that time, I turned as a buffer for Officer Ray. I was parroting what he was saying, which is "Go to class," while also trying to get the student to calm down and stop. There was a lot of profanity that was being directed at Officer Ray from [juvenile], and there were others. My involvement at that point was to plead with the student to please stop, and to be calm, and that he was making it worse. "Just stop and breathe. You are making it worse."

At this point, another student reaches in and physically grabs [juvenile] to pull him. Officer Ray is turning to tell students to go to class. The student that has made contact with [juvenile] to pull him is refusing to go to class and comply. At that point, Officer Ray took a hand and grabbed that student and had both students, essentially, held. They slid down the wall maybe two feet, maybe three, to the conference room. They went in. I went in behind them, so I observed that part of the process.

The juvenile did not testify or present any evidence. Through counsel, the juvenile moved to dismiss both petitions on the basis that the State had presented insufficient evidence to support an adjudication of delinquency.

The district court denied the motion to dismiss and found as fact that "[j]uvenile threw a chair in the cafeteria where students and teacher[s] were present and ran away [illegible]. Juvenile refused to cooperate with officer when asked and became belligerent. Juvenile delayed the investigation and caused a scene instead of cooperating." The district court adjudicated the juvenile to be delinquent for disorderly conduct and for resisting a public officer. On 27 February 2017, the district court entered an order imposing a Level 1 disposition. The juvenile gave notice of appeal.

In the Court of Appeals, the juvenile argued that his petition for disorderly conduct under N.C.G.S. § 14-288.4 was defective because it did not specify the subsection of the statute that he had allegedly violated. The juvenile also challenged on appeal the district court's denial of his motion to dismiss both petitions due to insufficiency of the evidence. The entire Court of Appeals panel agreed that the evidence was insufficient to support the juvenile's adjudication of delinquency for resisting a public officer, and the court therefore vacated the adjudication and disposition for this charge. *In re T.T.E.*, 818 S.E.2d 324, 328–29 (N.C. Ct. App. 2018).[2]

---

[2] The resolution of the alleged offense of resisting a public officer is not before this

However, the Court of Appeals panel divided regarding the sufficiency of the evidence to support the disorderly conduct adjudication. The majority agreed with the juvenile that

> [t]he evidence was not sufficient to show that the juvenile fought, engaged in violent conduct, or created an imminent risk of fighting or other violence. Although there were other students in the cafeteria—a very large room— when the juvenile threw a chair, no other person was nearby, nor did the chair hit a table or another chair or anything else. Juvenile then ran out of the cafeteria. This is not "violent conduct or . . . conduct creating the threat of imminent fighting or other violence." No one was hurt or threatened during the event and juvenile did not escalate the situation by yelling, throwing other things, raising fists, or other such conduct that along with the throwing of the chair could be construed to indicate escalating violent behavior. Throwing a single chair with no other person nearby and without attempting to hit another person and without hitting even any other item in the cafeteria is not disorderly conduct as defined by North Carolina General Statute § 14-288.4(a)(1).

*Id.* at 327–28 (citing and quoting N.C.G.S. § 14-288.4(a)(1)). The Court of Appeals consequently vacated the juvenile's adjudication of delinquency on the charge of disorderly conduct as well as the disposition that the district court had entered upon that delinquency adjudication. *Id.* at 328. In light of this outcome, the majority did not address the juvenile's contention that there was a fatal defect in the disorderly conduct petition.

---

Court.

The dissenting judge disagreed with the majority regarding the sufficiency of the evidence on the charge of disorderly conduct, opining that

> viewing this evidence in the light most favorable to the State, the safety resource officer's testimony that juvenile threw a chair, which the juvenile admitted he was throwing at another student, his brother, provided substantial evidence of violent conduct, from which the trial court could reasonably determine that juvenile's act of throwing a chair at another student amounted to violent conduct.

*Id.* at 330 (Arrowood, J., concurring in part and dissenting in part). Regarding the alleged defect in the disorderly conduct petition, the dissenting judge further opined:

> The petition at issue alleged juvenile violated N.C. Gen. Stat. § 14-288.4 when he "did intentionally cause a public disturbance at Clyde A. Erwin High School, Buncombe County NC, by engaging in violent conduct. This conduct consisted of throwing a chair toward another student in the school's cafeteria." Because this language closely tracks the statutory language of N.C. Gen. Stat. § 14-288.4(a)(1), "[d]isorderly conduct is a public disturbance intentionally caused by any person who . . . [e]ngages in fighting or other violent conduct or in conduct creating the threat of imminent fighting or other violence[,]" and the petition lists the offense as N.C. Gen. Stat. § 14-288.4, I would hold that, based on the totality of the circumstances, the petition averred the charge with sufficient specificity that juvenile was clearly apprised of the conduct for which he was charged. *See State v. Simpson*, 235 N.C. App. 398, 402-403, 763 S.E.2d 1, 4-5 (2014) (holding an indictment was not fatally defective even though it did not list which subsection of a statute the defendant was charged with violating because it was clear from the indictment which subsection was charged). Therefore, the petition was not fatally defective, and the trial court had jurisdiction to

> enter the adjudication and disposition orders against juvenile.

*Id.* at 329–30.

The State filed a motion for temporary stay and a petition for writ of *supersedeas* on 1 August 2018. This Court allowed the motion to stay on 2 August. On 21 August 2018, the State filed its notice of appeal in this Court based upon the dissent in the lower appellate court. We allowed the State's petition for writ of *supersedeas* on 4 September 2018.

## *Analysis*

As an initial matter, we briefly address the question of whether the delinquency petition charging disorderly conduct sufficiently alleged a violation of N.C.G.S. § 14-288.4. "[A] petition in a juvenile action serves essentially the same function as an indictment in a felony prosecution and is subject to the same requirement that it aver every element of a criminal offense, with sufficient specificity that the accused is clearly apprised of the conduct for which he is being charged." *In re Griffin*, 162 N.C. App. 487, 493, 592 S.E.2d 12, 16 (2004); *see also In re Burrus*, 275 N.C. 517, 530, 169 S.E.2d 879, 887 (1969) ("Notice must be given in juvenile proceedings which would be deemed constitutionally adequate in a civil or criminal proceeding; that is, notice must be given the juvenile and his parents sufficiently in advance of scheduled court proceedings to afford them reasonable opportunity to

prepare, and the notice must set forth the alleged misconduct with particularity." (citation omitted)), *aff'd sub nom. McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (plurality opinion). As the dissenting opinion in the present case correctly noted, the petition here closely tracked the language of N.C.G.S. § 14-288.4. This Court has long held that

> the "true and safe rule" for prosecutors in drawing indictments is to follow strictly the precise wording of the statute because a departure therefrom unnecessarily raises doubt as to the sufficiency of the allegations to vest the trial court with jurisdiction to try the offense. Nevertheless, it is not the function of an indictment to bind the hands of the State with technical rules of pleading; rather, its purposes are to identify clearly the crime being charged, thereby putting the accused on reasonable notice to defend against it and prepare for trial, and to protect the accused from being jeopardized by the State more than once for the same crime. Thus, . . . an indictment shall not be quashed "by reason of any informality or refinement" if it accurately expresses the criminal charge in "plain, intelligible, and explicit" language sufficient to permit the court to render judgment upon conviction.

*State v. Sturdivant*, 304 N.C. 293, 310–11, 283 S.E.2d 719, 731 (1981) (footnote and citations omitted). Here, the State followed the articulated "true and safe rule" by substantially employing the terminology of N.C.G.S. § 14-288.4 in the delinquency petition that initiated the disorderly conduct action. Because the petition averred the offense of disorderly conduct with sufficient specificity to clearly apprise the juvenile here of the offense with which he was charged, the district court was properly cloaked with subject-matter jurisdiction over this alleged offense.

With the jurisdictional issue having been addressed, we turn to the substantive issue regarding the sufficiency of the evidence presented by the State at trial to withstand the juvenile's motion to dismiss.

This Court performs de novo review of the denial of a motion to dismiss for insufficiency of the evidence in order to determine "*only* whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Turnage*, 362 N.C. 491, 493, 666 S.E.2d 753, 755 (2008) (emphasis added) (quoting *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996)); *see also, e.g.*, *State v. Hunt*, 365 N.C. 432, 436, 722 S.E.2d 484, 488 (2012). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Turnage*, 362 N.C. at 493, 666 S.E.2d at 755 (quoting *Crawford*, 344 N.C. at 73, 472 S.E.2d at 925). In undertaking this determination, "[a]ny contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered." *State v. Miller*, 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (citations omitted). "[S]o long as the evidence supports a reasonable inference of the defendant's guilt, a motion to dismiss is properly denied even though the evidence also 'permits a reasonable inference of the defendant's innocence.'" *Id.* at 99, 678 S.E.2d at 594 (quoting *State v. Butler*, 356 N.C. 141, 145, 567 S.E.2d 137, 140 (2002)).

"Disorderly conduct is a public disturbance intentionally caused by any person who" perpetrates one or more acts listed in the General Statutes. N.C.G.S. § 14-288.4(a) (2017). In the case at bar, the disorderly conduct petition averred that the juvenile was delinquent for a violation of section 14-288.4(a)(1). Although the juvenile petitions did not specifically cite subdivision (a)(1) of that statute, we note that the juvenile's alleged act of "throwing a chair toward another student in the school's cafeteria" placed him in the category of "any person who . . . [e]ngages in fighting or other violent conduct or in conduct creating the threat of imminent fighting or other violence." *Id.* § 14-288.4(a)(1). A "public disturbance" is defined as:

> Any annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a substantial group has access. The places covered by this definition shall include, but not be limited to, highways, transport facilities, *schools*, prisons, apartment houses, places of business or amusement, or any neighborhood.

*Id.* § 14-288.1(8) (2017) (emphasis added). Accordingly, this Court must determine whether, as we view the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference, *see Miller*, 363 N.C. at 98, 678 S.E.2d at 594, substantial evidence was presented at the adjudication hearing that the juvenile perpetrated an "annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place" by means of

"[e]ngag[ing] in fighting or other violent conduct or in conduct creating the threat of imminent fighting or other violence." N.C.G.S. §§ 14-288.1(8), -288.4(a)(1).

The juvenile contends that the evidence presented by the State could support an inference that he was simply engaged in horseplay with his brother, that he did not intend to harm any person or property, and that he did not actually cause harm to any person or property. While we do not disagree that such inferences could be drawn from the evidence, *any* contradictions or conflicts in the evidence are resolved in favor of the State on a motion to dismiss for insufficiency of the evidence. The juvenile's misconstruction of the law is likewise exhibited in the erroneous conclusion of the Court of Appeals majority that "[t]hrowing a single chair with no other person nearby and without attempting to hit another person and without hitting even any other item in the cafeteria is not disorderly conduct as defined by North Carolina General Statute § 14-288.4(a)(1)." *In re T.T.E.*, 818 S.E.2d at 328 (majority opinion). Based on its own review of the evidence presented at the adjudication hearing, the majority of the lower appellate court erroneously decided to ultimately determine whether the juvenile committed the offense of disorderly conduct. But the proper question before the district court, the Court of Appeals, and now this Court, when considering the juvenile's motion to dismiss based on all of the evidence presented at the adjudication hearing, which must be viewed in the light most favorable to the State, is whether the evidence merely could support an inference that the juvenile

committed the offense of disorderly conduct. *See Miller*, 363 N.C. at 98, 678 S.E.2d at 594.

In the light most favorable to the State, the evidence presented at the adjudication hearing tended to show that the juvenile threw a chair at his brother across the EHS cafeteria where other students were present. The juvenile then ran out of the cafeteria and through the school's hallways. The juvenile's behavior occurred during a part of the school day when students were not in class and were allowed to move relatively freely about the campus in order to receive tutoring and to relax. As a result, a number of EHS students were able to observe the interaction between the juvenile and Deputy Ray after the school resource officer saw the juvenile throw the chair and after the deputy was able to successfully pursue the juvenile. While the school resource officer executed his responsibilities which included a search of the juvenile, the juvenile cursed at the deputy. After the school resource officer opted to place the juvenile in handcuffs, other students also directed profane words toward the deputy in raised voices and became actively involved in the interaction between the two, resulting in the officer handcuffing and arresting another EHS student. The deputy considered the juvenile's act of throwing the chair as constituting conduct that disrupted or disturbed the process of school, including the efforts of students to attend their classes in a timely fashion. EHS faculty member McQueen described the circumstances as constituting "a significant safety issue with

students gravitating towards that situation" to the extent that the teacher and coach "turned as a buffer for Officer Ray."

Upon viewing this evidence in the light most favorable to the State and giving the State the benefit of every reasonable inference as required by *Miller*, we conclude that substantial evidence was presented at the adjudication hearing that the juvenile perpetrated an "annoying, disturbing, or alarming act . . . exceeding the bounds of social toleration normal for" Clyde A. Erwin High School during the course of the instructional day through a public disturbance as defined by N.C.G.S. § 14-288.1(8) by "engaging in violent conduct" by "throwing a chair toward another student in the school's cafeteria." As a result, the juvenile petition alleged a violation of N.C.G.S. § 14-288.4, which defines the public disturbance of disorderly conduct. The evidence presented by the State was sufficient to warrant the denial of the juvenile's motion to dismiss the petition that alleged his commission of the delinquent act of disorderly conduct. In applying the *Miller* standard to the current case, the district court properly denied the juvenile's motion to dismiss.

Based on the foregoing considerations, as to the issue before this Court on appeal, namely, whether the Court of Appeals majority erred in holding that the State's evidence was insufficient to support the adjudication for disorderly conduct, the decision of the Court of Appeals is reversed. Accordingly, we reverse the decision of the Court of Appeals vacating the adjudication and disposition orders relating to

that offense.  The Court of Appeals decision to vacate the adjudication and disposition orders entered in regard to the charge of resisting a public officer remains undisturbed.

REVERSED.

Justice EARLS, dissenting.

Here the State presented evidence that a high school student threw a chair in his school cafeteria. Beyond the basic fact that a chair was thrown, the State's sole witness to this event, the school's resource officer, provided few details regarding the specifics of this chair-throwing, save that the chair did not hit anyone, that the officer did not see anyone moving to avoid being hit by the chair, and that the officer could not say, despite being very close to the student, whether there was any risk of the chair striking any other person or object in the cafeteria. The officer testified that the student later told him that the student had thrown the chair "at his brother because they were playing or something." The majority considers this testimony to be substantial evidence from which a rational juror could find—beyond a reasonable doubt—that the student, T.T.E., is guilty of the Class 2 misdemeanor offense of disorderly conduct on the basis that he *intentionally* caused a public disturbance by engaging in *violent conduct*. Either the majority is adopting an uncommonly broad view of what constitutes violent conduct, or, in applying what it deems a "relatively low threshold" for sufficiency of the evidence,[1] the majority is mistaking evidence that raises a mere suspicion of guilt for substantial evidence. In any event, because I conclude that the State presented insufficient evidence that T.T.E. committed the

---

[1] The majority cites no precedent for the assertion that the sufficiency of evidence standard requires only a "relatively low threshold" of evidence.

offense of disorderly conduct by intentionally causing a public disturbance by engaging in violent conduct, I respectfully dissent.

"Disorderly conduct" is a criminal offense defined as "a public disturbance[2] intentionally caused by any person who" commits any of the acts set forth in N.C.G.S. § 14-288.4(a)(1)-(8), including, *inter alia*, any person who:

> (1) Engages in fighting or other violent conduct or in conduct creating the threat of imminent fighting or other violence.
>
> . . . .
>
> (6) Disrupts, disturbs or interferes with the teaching of students at any public or private educational institution or engages in conduct which disturbs the peace, order or discipline at any public or private educational institution or on the grounds adjacent thereto.

N.C.G.S. § 14-288.4(a)(1), (6) (2017). Here, Deputy Mickey Ray of the Buncombe County Sheriff's Office filed a petition in district court on 8 November 2016 alleging that T.T.E. was a delinquent juvenile because he had committed the Class 2

---

[2] As the majority notes, a "public disturbance" is defined as:

> Any annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a substantial group has access. The places covered by this definition shall include, but not be limited to, highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

N.C.G.S. § 14-288.1 (2017).

misdemeanor offense of disorderly conduct by "intentionally caus[ing] a public disturbance at Clyde A. Erwin High School, Buncombe County NC, by engaging in violent conduct. This conduct consisted of throwing a chair toward another student in the school's cafeteria."

The majority concludes that although the disorderly conduct petition did not specify which of the various subsections of N.C.G.S. § 14-288.4(a) was at issue, the petition gave sufficient notice to T.T.E. of the specific conduct and offense for which he was being charged because it closely tracked the language of N.C.G.S. § 14-288.4(a)(1) ("Engages in . . . violent conduct"). Assuming *arguendo* that T.T.E. did have sufficient notice that he was being charged under (a)(1),[3] the State was, as a result, necessarily limited to proceeding on what was alleged in the petition—namely, that T.T.E. intentionally committed the offense of disorderly conduct under (a)(1) by "engaging in violent conduct," specifically "by throwing a chair toward another student in the cafeteria."

Accordingly, the State was required to present *substantial evidence* that T.T.E. intentionally caused a public disturbance by engaging in violent conduct by throwing a chair toward another student in the cafeteria. *See State v. Barnes*, 345 N.C. 146, 148, 478 S.E.2d 188, 189 (1996) (stating that a "motion to dismiss must be allowed

---

[3] It is worth noting, however, that the State attempted to prove T.T.E.'s guilt at the adjudicatory hearing under both (a)(1) and (a)(6) ("Disrupts, disturbs or interferes with the teaching of students at any public or private educational institution or engages in conduct which disturbs the peace, order or discipline at any public or private educational institution or on the grounds adjacent thereto.").

unless the State presents substantial evidence of each element of the crime charged" (quoting *State v. Davis*, 340 N.C. 1, 11, 455 S.E.2d 627, 632, *cert. denied*, 516 U.S. 846 (1995))). "Evidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong." *State v. Sumpter*, 318 N.C. 102, 108, 347 S.E.2d 396, 399 (1986) (citing *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983)); *see also State v. Turnage*, 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008) ("A motion to dismiss should be granted, however, 'where the facts and circumstances warranted by the evidence do no more than raise a suspicion of guilt or conjecture since there would still remain a reasonable doubt as to defendant's guilt.' " (quoting *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988))). While the majority, in its discussion of the applicable de novo standard of review, correctly notes that "[s]ubstantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion," *Turnage*, 362 N.C. at 493, 666 S.E.2d at 755 (citation omitted), it is helpful to bear in mind the nature of this "conclusion" that must be adequately supported. Specifically, "[s]ubstantial evidence is evidence from which any rational trier of fact could find the fact to be proved *beyond a reasonable doubt*." *Sumpter*, 318 N.C. at 108, 347 S.E.2d at 399 (emphasis added) (citing *State v. Pridgen*, 313 N.C. 80, 94–95, 326 S.E.2d 618, 627 (1985)); *see also State v. Trull*, 349 N.C. 428, 447, 509 S.E.2d 178, 191 (1998) ("A defendant's motion to dismiss must be denied if the evidence considered in the light most favorable to the State permits a rational jury to find beyond a reasonable doubt the existence of each element of the

charged crime and that defendant was the perpetrator." (citation omitted)).  After all, the evidentiary standard in a juvenile delinquency proceeding is the same as that in adult criminal proceedings.  *See* N.C.G.S. § 7B-2409 (2017) ("The allegations of a petition alleging the juvenile is delinquent shall be proved beyond a reasonable doubt."); *see also, e.g.*, *In re A.N.C., Jr.*, 225 N.C. App. 315, 324, 750 S.E.2d 835, 841 (2013) ("A 'juvenile is therefore entitled to have the evidence evaluated by the same standards as apply in criminal proceedings against adults.' " (quoting *In re Heil*, 145 N.C. App. 24, 28, 550 S.E.2d 815, 819 (2001))).

The only evidence presented here by the State concerning T.T.E's actions in the cafeteria was the testimony of Deputy Ray, who was the school resource officer for Clyde A. Erwin High School at the time of the incident.  Although Ray was an eyewitness to the chair-throwing, as discussed further below, the most salient part of his testimony with respect to the offense charged was his second-hand relation of what T.T.E. told him after the incident:

> Q.     And did [T.T.E.] ever tell you why he threw the chair?
>
> A.     He said he was -- him and his brother -- he said he threw it at his brother because they were playing or something.
>
> . . . .
>
> THE WITNESS:    [T.T.E.] told me that him and his brother was having some issues, or were playing or something.  And he threw the chair at his brother.

. . . .

Q.    So students would not have been disrupted, in that they weren't in that area to begin with, correct?

A.    Yes, there was students there.  At one particular time, there were students.  They were not -- at the time that he threw the chair, I don't know if there was students at that particular time or not, because they were running from him, each other.  They were playing -- horse playing with each other.

Q.    Okay.  So let's go back.  Now we have students horse playing.  So who was horse playing with whom?

A.    Well, according to his statement, after I talked to him and asked him what happened, he said that him and his brother was horse playing or he was doing something with his brother.  And they were going at it.

Viewing it in the light most favorable to the State, Ray's testimony in this respect can fairly be said to raise a suspicion that T.T.E. engaged in violent conduct, but no more than a suspicion.  For instance, any inference from this testimony alone that T.T.E. was attempting to *strike* or *injure* his brother with the chair, would not be one from which a rational jury could find such facts beyond a reasonable doubt.  I cannot conclude that on the basis of this second-hand relation of T.T.E.'s out of court statements—to the effect that T.T.E. threw a chair at his brother because they were playing or something—any rational trier of fact could find beyond a reasonable doubt that T.T.E. intentionally threw a chair in a manner that constituted *violent conduct* in order to cause a public disturbance.

Certainly, there are ways in which throwing a chair would conceivably

constitute violent conduct. Yet, unless the majority intends to hold that throwing a

chair in a school cafeteria is *per se* violent conduct,[4] the specifics would seem

---

[4] This notion was rejected by the Court of Appeals majority below. Misconstruing that part of the opinion, the majority here asserts that the majority below "erroneously decided to ultimately determine whether the juvenile committed the offense of disorderly conduct." A fair reading of the Court of Appeals majority's decision, however, clearly shows that the court was not purporting to adjudicate an ultimate issue of fact, but rather concluded that the State's evidence only gave rise to a reasonable inference that a chair was thrown, which, without more, is not violent conduct as a matter of law and is therefore insufficient evidence to be presented to the jury:

> The State contends the evidence shows "arguably violent conduct" because *if* the juvenile had thrown the chair at another student and *if* it hit them, "it presumably would have hurt them."
>
> Although we view the evidence in the light most favorable to the State, we do not go so far as to come up with hypothetical events that could have happened if juvenile actually did something in addition to what the actual evidence shows. . . . The State simply asks we infer too much from the evidence it presented.
>
> The evidence was not sufficient to show that the juvenile fought, engaged in violent conduct, or created an imminent risk of fighting or other violence. Although there were other students in the cafeteria—a very large room—when the juvenile threw a chair, no other person was nearby, nor did the chair hit a table or another chair or anything else. Juvenile then ran out of the cafeteria. This is not "violent conduct or . . . conduct creating the threat of imminent fighting or other violence." No one was hurt or threatened during the event and juvenile did not escalate the situation by yelling, throwing other things, raising fists, or other such conduct that along with the throwing of the chair could be construed to indicate escalating violent behavior. Throwing a single chair with no other person nearby and without attempting to hit another person and without hitting even any other item in the cafeteria is not disorderly conduct as defined by North Carolina General Statute § 14-288.4(a)(1). We vacate juvenile's adjudication and disposition for disorderly conduct.

necessary: How far and high did the chair travel? Was the chair thrown overhand or underhand? Was the chair moving fast or slow? Was the chair thrown with great force? How big was the chair? Did the chair make a loud crash? Was T.T.E. trying to hit his brother, or anyone or anything else? Was his brother waiting to catch the chair? Did the chair come close to hitting anything? The sole eyewitness to testify at the hearing on this issue, Deputy Ray, did provide the answers to a few of these questions. Of course, viewing his testimony in the light most favorable to the State, Ray's description of the event itself must largely be ignored as it tends to contradict the State's suggestion that that this chair-throwing amounted to violent conduct. *See State v. Miller*, 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (stating that "evidence unfavorable to the State is not considered" (citing *State v. Parker*, 354 N.C. 268, 278, 553 S.E.2d 885, 894 (2001), *cert. denied*, 535 U.S. 1114 (2002))).

According to Ray, the incident happened during "Warrior period . . . where all the students get to just come out and relax a little bit, maybe hang out in the cafeteria." Ray was at the cafeteria wall, "just standing there observing" the 50 or 60 students in the cafeteria at that time. Near the end of Warrior period, Ray saw T.T.E. pick up a chair and throw it "in an underhanded motion." According to Ray, "I noticed [T.T.E.] pick up a chair and throw it across the cafeteria, kind of like, throw it across.

---

*In re T.T.E.*, 818 S.E.2d at 327–28 (citations omitted) (second alteration in original).

. . . I saw him pick up the chair, I thought he was just going to move it, but he kind of picked it up and chucked it." Ray testified:

> Q.     And you testified that this is in a cafeteria full of students -- about 50 or 60 students, correct?
>
> A.     Yes.
>
> Q.     And none of these students were touched with the chair?
>
> A.     No.  Because --
>
> Q.     Did you see any students ducking from the chair being thrown across the cafeteria?
>
> A.     No.  I didn't see any of that.

After throwing the chair, T.T.E. "ran out of the cafeteria, and ran down to the foreign language halls." Ray testified that when T.T.E. threw the chair, he was "very close by" to T.T.E. and that T.T.E. was "pretty much, within [his] full range of sight." Despite his close proximity to T.T.E., Ray had few other details to offer:

> Q.     And did he throw it at anybody in particular, that you know of?
>
> A.     I can't remember, to be honest.
>
> . . . .
>
> Q.     Did it appear to you that, based on what you saw with the chair throwing incident, that [T.T.E.] was playing, or did it seem like something that was a little more violent?
>
> A.     I couldn't really tell[.]
>
> . . . .

Q.      . . . Were any of the tables hit, whenever this chair was moved?

A.      I can't recall.

Q.      Do you know if any of the chairs were hit, due to the chair being moved or thrown?

A.      I can't recall.  Once he threw the chair, I turned around and went out, after he ran.

. . . .

Q.      Okay.  So let's stop right there.  Can you remember, if you recall, what was [T.T.E.] looking at when the chair was thrown?

A.      Well, he looked down to pick up the chair, and he picked it up and threw it.

Q.      And there were no children in his general vicinity, correct?

A.      I can't really -- I can't tell.

Thus, Ray's description of the event does little to bolster what is missing from T.T.E.'s out of court statement—that is explain what, exactly, about this chair-throwing made it violent conduct done intentionally to cause a public disturbance.

The majority, perhaps recognizing the paucity of evidence concerning the actual throwing of the chair, devotes considerable attention to the evidence regarding what occurred *after* the chair was thrown in the cafeteria, when the "6'3-and-a-half" Deputy Ray chased down the "5 foot" tall T.T.E. in the foreign language hallway, "snuck up on him" and grabbed him by the sweatshirt, then "brought him back up to

the main lobby where [Ray] put him on the wall, just to search him, and then put cuffs on him." It was at that point that T.T.E. "started cussing, calling [Ray] all kind of names" and was "when all the other kids started trying to get involved."[5] According to Ray, "Another guy, I had to handcuff him also, because he was trying to keep me from, you know, getting -- just, you know, detaining him. So, he came up behind me, and I grabbed him and put him on the wall also." This evidence was relevant to defendant's adjudication for the charge of resisting a public officer, which the Court

_____

[5] The majority states that "[t]he deputy considered the juvenile's act of throwing the chair as constituting conduct that disrupted or disturbed the process of school, including the efforts of students to attend their classes in a timely fashion." This portion of the hearing was, in part, an attempt by the prosecutor to elicit testimony regarding N.C.G.S. § 14-288.4(a)(6), which was not alleged in the petition. More importantly, however, this statement was referring, not to the throwing of the chair in the cafeteria, of which there was no evidence concerning any disruption, but rather to T.T.E.'s conduct in the hallway when being detained by Ray:

> Q.     Now, as [T.T.E.] was pulling away from you and yelling at you, what duty were you trying to perform?
>
> A.     I was trying to detain him and bring him back to the office to sit down and have a discussion with the administrators and do what I needed to do. And at that point in time, he was resisting and didn't want to come.
>
> Q.     Based on your view of how the other students reacted to all of this as it was going on, did it, in your opinion, in any way disrupt or disturb the process of the school --
>
> A.     Absolutely.
>
> Q.     -- by which I mean, going back to classes?
>
> A.     Yes, sir. Absolutely.

of Appeals unanimously vacated for insufficient evidence, *In re T.T.E.*, 818 S.E.2d 324, 328–29 (2018), and which, because the State did not seek further review of that decision, is not before this Court. This evidence presumably would have been relevant had the State elected to adjudicate T.T.E. for disorderly conduct under a different section of N.C.G.S. § 14-288.4 and for conduct separate from that listed in the petition. This evidence, however, is irrelevant as to whether T.T.E. intentionally caused a public disturbance by engaging in violent conduct "by throwing a chair toward another student in the cafeteria."

Indeed, much of the issue in this case stems from the fact while the petition limited the State to adjudicating T.T.E. for disorderly conduct based on his actions in the cafeteria, the State sought in earnest to adjudicate T.T.E. for his conduct after he threw the chair and left the cafeteria. For instance, at the hearing, the State argued in closing:

> When that one student throws a chair, and then 50 or 60 students see the deputy standing up against the wall with his arms crossed, and doesn't do anything, now chair throwing is okay in the school cafeteria. So he goes down there to address that situation, make sure it doesn't happen again. And then it blew way out of proportion. It did not have to do that. Cuffs did not have to get involved. This did not -- this whole thing did not have to happen. It could've just been a quick, "Hey, what's going on? You horsing around? Well, don't do that anymore." But it was [T.T.E.] that elevated that situation.
>
> . . . .
>
> Violent conduct is not just picking up a chair and

> removing it from the floor entirely, but also when you are standing in a hallway, surrounded by a bunch of students, a crowd, and telling an officer, "Fuck you. You ain't shit," and physically fighting with him. Now, that's absolutely disorderly conduct.

Certainly, "chair throwing . . . in the school cafeteria" is normally not acceptable conduct, and schools have disciplinary measures to address it. There are, however, countless situations in which such behavior falls short of "fighting or other violent conduct." When the State seeks to invoke criminal processes on the basis of such conduct, it must present substantial evidence that the conduct amounts to a criminal offense. Here the State failed to do so. Accordingly, I dissent.